**UNITED STATES**

v.

**Howard G. LOCKWOOD\*.**

**No. Cr. 43456.**

United States District Court,
E. D. New York.

Sept. 30, 1974.

* Consolidated with: Dewey, 68–CR–456; Lidov, 68–CR–67; Rosenbaum, 68–CR–204; Friedman, 69–CR–54; Dorn, 69–CR–57; Wilson, 69–CR–155; Campus, 69–CR–182; Henry, 71–CR–1338; Blumer, 72–CR–478; Austin, 72–CR–494; Territo, 72–CR–622; Parker, 72–CR–739; Salzmann, 72–CR–740; Sleeth, 72–CR–757; Higgs, 72–CR–780; Perez, 72–CR–803; Martinez, 72–CR–810; Luerssen, 72–CR–824; Frazier, 72–CR–834; Collura, 72–CR–1028; Bezousek, 72–CR–1290; Estremera, 72–CR–1291; Nolan, 73–CR–41; Powers, 73–CR–126; and Albanese, 73–CR–132; U. S. v.

**1112**

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for the United States; Edward R. Korman, Thomas Mahrer, of counsel.

Louis Lusky, New York City, for defendants.

Michael E. Tigar, Williams, Connolly & Califano, Washington, D. C., amicus curiae.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

By its order of September 10, 1974, this court appointed Louis Lusky, Esq. to appear on behalf of fugitive defendants in twenty-six selective service criminal cases and ordered the United States to give notice of this appointment to each defendant at his last known address. The order provided that the court would receive communications from the defendant, his relative, or his next best friend.

The government moves to vacate the order on the ground that this court lacks jurisdiction to take action in a fugitive case unless the defendant first surrenders. Before turning to the important substantive and procedural issues raised by the government's contention, a word needs to be said on the issue of the court's and the United States Attorney's power to control criminal calendars.

### COURT CONTROL OF CRIMINAL CALENDARS

Until a few years ago the practice in the Eastern District of New York was for cases to be listed on a general calendar. When a motion was to be heard or the case brought on for trial, it would be placed on the calendar of whichever judge was hearing motions or trying cases. As a result, many judges might decide different aspects of the same case and, to a considerable degree, counsel could determine which judge would hear a motion by waiting until a particular judge was in a motion part. The United States Attorney had considerable control over criminal calendars. By moving a case for trial or asking for adjournments he could indirectly select the judge. Since no one judge had responsibility for any particular case, unless the United States Attorney made a motion, fugitive cases lay dormant.

The judges of this district adopted an individual assignment system so that litigations could be disposed of more efficiently and fairly. A case is now randomly assigned to a judge immediately after indictment and he is personally responsible for its prompt disposition. Rule 2(b) Individual Assignment and Calendar Rules, Eastern District of New York, effective October 1, 1969.

The individual calendar system is part of an integrated program devised during the past few years by the federal courts to ensure "the prompt disposition of criminal cases." Federal Rules of Criminal Procedure, Rule 50(b). Pursuant to Rule 50(b) the judges of the Eastern District of New York adopted a Plan for Achieving Prompt Disposition of Criminal Cases, effective April 1, 1973, "to further the prompt disposition of criminal cases." In United States v. Furey, 500 F.2d 338, at 341 (2d Cir. 1974), the court noted that the policies supporting the Plan included

"the deterrence afforded by prompt disposition, the potential prejudice to any defense arising from delay, as

well as the disruption and anxiety created by a criminal charge."

See also United States v. Favaloro, 493 F.2d 623 (2d Cir. 1974); United States v. Bowman, 493 F.2d 594 (2d Cir. 1974); Hilbert v. Dooling, 476 F.2d 355 (2d Cir.) (en banc), cert. denied, 414 U.S. 878, 94 S.Ct. 56, 38 L.Ed.2d 123 (1973); United States v. Pierro, 478 F. 2d 386 (2d Cir. 1973); United States v. Rollins, 475 F.2d 1108 (2d Cir. 1973).

These rules were adopted pursuant to the inherent power of the courts over their calendars. They reflect a policy change from a passive judicial acceptance of laggard work in the courts to an assumption of responsibility for "fairness'. . . and the elimination of unjustifiable expense and delay" (Federal Rules of Criminal Procedure, Rule 2) in determining the merits of criminal charges.

In controlling my own calendars one procedure relied upon to guarantee prompt disposition of cases is to periodically call each fugitive case to determine if (1) the government is making reasonable efforts to apprehend the fugitive, (2) the public or defendant is being prejudiced by unnecessary delay, and (3) cases which should be dismissed are carried on the docket, artificially inflating the court's and prosecutor's apparent case load. My own docket illustrates why fugitive cases cannot be ignored. There are now sixty criminal cases assigned to me; two-thirds, or forty, are listed as fugitive cases (including twenty-six selective service cases); five have been assigned trial dates; three are awaiting assignment of trial dates, and twelve are awaiting sentence following a plea or finding of guilt.

All the fugitive cases before me are in the process of being called. Previously, such calls have led to dismissals and action by the government to apprehend defendants. The government has never objected to these calendar calls and the court deems them essential to properly control its calendar.

In the past attorneys for fugitive defendants have not been appointed because there appeared to be no reason to do so. But there is obviously good reason to appoint counsel in the selective service fugitive cases now before the court.

## SELECTIVE SERVICE CASES

The twenty-six defendants involved in this motion are covered by the provisions dealing with "draft evaders" in the President's proclamation of September 16, 1974, for they "allegedly unlawfully failed" to meet their obligations under the Military Selective Service Act. That part of the proclamation dealing with these cases reads as follows:

"DRAFT EVADERS—An individual who allegedly unlawfully failed under the Military Selective Service Act or any rule or regulation promulgated thereunder, to register or register on time, to keep the local board informed of his current address, to report for or submit to pre-induction or induction examination, to report for or submit to induction itself, or to report for or submit to, or complete service under Section 6(J) of such act during the period from Aug. 4, 1964, to March 28, 1973, inclusive, and who has not been adjudged guilty in a trial for such offense, will be relieved of prosecution and punishment for such offense if he:

"Presents himself to a United States Attorney before Jan. 31, 1975,

"Executes an agreement acknowledging his allegiance to the United States and the pledging to fulfill a period of alternate service under the auspices of the director of Selective Service.

"Satisfactorily completes such service.

"The alternate service shall promote the national health, safety or interest. No draft evader will be given the privilege of completing a period of al-

ternate service by service in the armed forces.

"However, this program will not apply to an individual who is precluded from reentering the United States under 8 U.S.C. 1182(A)(22) or other law. Additionally, if individuals eligible for this program have other criminal charges outstanding, their participation in the program may be conditioned upon, or postponed until after, final disposition of the other charges have been reached in accordance with law.

"The period of service shall be 24 months, which may be reduced by the Attorney General because of mitigating circumstances."

A release of the Office of the White House Press Secretary summarized the procedures to be followed by persons in the draft evader class:

## UNCONVICTED DRAFT EVADER

1. Report to United States Attorney where offense was committed.

2. Acknowledge allegiance to the United States by agreeing with the United States Attorney to perform 24 months alternate service or less based on mitigating circumstances.

3. Perform alternate service under the auspices of the director of Selective Service.

4. Director of Selective Service issues certificate of satisfactory completion of alternate service.

5. Receipt by United States Attorney of certificate of satisfactory completion of alternate service.

6. Dismissal of indictment or dropping of charges."

New York Times, September 17, 1974, p. 24, col. 4.

■ In effect, a pretrial diversion or deferred prosecution scheme is to be applied in these cases. *See e. g.*, Administrative Office of the United States Courts Annual Report of the Director at VIII–7 (1974). This technique is being considered favorably in a number of other types of cases. It is sometimes called the "Brooklyn Plan," for one form was developed in this court. Before or after indictment, but without trial or plea, the defendant is placed under supervision. If he responds favorably over a fixed period of time—usually one or two years—he is not indicted or, if he had been indicted, the indictment is dismissed.

The saving in time and money and the enhancement of the likelihood of rehabilitation make diversion programs attractive. But they present grave dangers unless they are strictly controlled. A guiltless person may be forced to undergo strict supervision and loss of liberty because he wants to avoid the expense and embarrassment of contesting the government's case. Efficiency rather than fairness may result in the "relaxation of standards of evidence and a presumption of guilt." *See*, R. W. Balch, Deferred Prosecution: The Juvenilization of the Criminal Justice System, 38 Federal Probation 46, 50 (June 1974). Some judicial procedural check is necessary.

"Without judicial and defense counsel intervention in the diversion decision to safeguard against potential abuses of discretion, there is the danger that the results of pretrial diversion—like those of the juvenile court which itself began as a diversion mechanism—may be found not to justify the risks taken with basic constitutional guarantees."

Note, Pretrial Diversion from the Criminal Process, 83 Yale L.J. 827, 853 (1974).

Some method must be utilized to prevent abuse of plans which divert cases from the normal criminal machinery to ensure that individual rights are being safeguarded. The agency with primary responsibility to prevent prosecutorial abuse after indictment is the court.

■■ While an indictment against a defendant remains outstanding, the pressure on him to agree to perform "alter-

nate service" is great even though the indictment may be invalid and there is no warrant in law for his being denominated a draft evader. We take judicial notice of the fact—based upon experience with many young men in this court accused of selective service violations—that a number of them are inexperienced and not capable of determining their rights without counsel. Some have taken emotional positions, fleeing when their problems could easily have been resolved to their own and the government's satisfaction had they had competent legal advice. It is significant that private counsel generally were not permitted to accompany men appearing before local selective service boards. *See, e. g.,* Levine v. Selective Service Loc. Bd. No. 18, 458 F.2d 1281, 1287, n. 22 (2d Cir. 1972). This fact alone resulted in many errors; the lay boards with all their fine intentions and devotion to the public good, often made mistakes through lack of legal guidance.

The possibility that a selective service indictment will not be supported by the record is not insubstantial. As the table set out below indicates, a large portion of the selective service cases considered by the courts are dismissed.

DISPOSITION OF DEFENDANTS CHARGED WITH SELECTIVE SERVICE VIOLATIONS

| Year | Total | Dismissed Number | % | Acquitted Number | % | Total Convicted Number | % | Probation, Fine & Other Number | % | Average Imprisonment (Month) |
|------|-------|--------|------|--------|-----|---------|------|--------|------|------------|
| 1965 | 341 | 88 | 25.8 | 11 | 3.2 | 242 | 71.0 | 53 | 15.5 | 21.0 |
| 1966 | 516 | 132 | 25.6 | 13 | 2.5 | 371 | 71.9 | 70 | 13.6 | 26.4 |
| 1967 | 996 | 224 | 22.5 | 24 | 2.4 | 748 | 75.1 | 82 | 8.2 | 32.1 |
| 1968 | 1,192 | 353 | 29.6 | 55 | 4.6 | 784 | 65.8 | 204 | 17.1 | 37.3 |
| 1969 | 1,744 | 747 | 42.8 | 97 | 5.6 | 900 | 51.6 | 356 | 20.4 | 36.3 |
| 1970 | 2,833 | 1,570 | 55.4 | 236 | 8.3 | 1,027 | 36.3 | 577 | 20.4 | 33.3 |
| 1971 | 2,973 | 1,701 | 57.2 | 236 | 7.9 | 1,036 | 34.9 | 659 | 22.2 | 29.1 |
| 1972 | 4,906 | 2,937 | 59.9 | 327 | 6.7 | 1,642 | 33.5 | 1,184 | 24.1 | 22.0 |
| 1973 | 3,495 | 2,338 | 66.9 | 180 | 5.2 | 977 | 28.0 | 717 | 20.5 | 17.5 |

Source: 1974 Semi-Annual Report of the Director, Administrative Office of the United States, 62 (May 1974)

It is significant that in 1973 in the country as a whole more than two-thirds of the selective service indictments terminated were dismissed. Only seven percent of defendants whose cases were disposed of by the courts were imprisoned; the average term was 17.5 months before time off for good behavior. Many of those convicted were sentenced under the Youth Correction Act so that, upon completion of their supervision, they were granted a certificate setting aside their conviction. 18 U.S.C. § 5021. It is apparent that the overwhelming majority of those indicted whose cases were disposed of by the courts in 1973 received more "lenient" treatment than would be accorded under the President's proclamation. There is no reason to suspect that the clear trend against severity in these cases will be reversed in 1974.

Both from the point of view of effective calendar control and protection of the rights of those accused of draft evasion, it is desirable to screen these selective service cases to determine if they have any merit. But the government contends that the court lacks power to do this unless the defendant first surrenders, the question to which we now turn.

POWER OF THE COURT TO DECIDE
MOTIONS ON BEHALF OF
FUGITIVES

█ It is unusual for the government to urge the court's lack of power to determine matters in the absence of a defendant. The rules against trials in absentia were designed to protect the defendant's, not the government's, rights. *See, e. g.,* the right to confrontation in the Sixth Amendment. As Mr. Justice

Cardozo pointed out in Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105–106, 54 S.Ct. 330, 332, 78 L.Ed. 674, 678 (1934):

> "[t]he defendant has the privilege . . . to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." (Emphasis supplied.)

The court rejected the need for the defendant's presence "when presence would be useless, or the benefit but a shadow." Id. at 106–107, 54 S.Ct. at 332, 78 L.Ed. at 678.

Certainly the defendant cannot be present at preliminary phases of the criminal proceeding such as indictment. Normally he is not required to be present on calendar calls or the argument of preliminary motions. Under Rule 12 of the Federal Rules of Criminal Procedure, motions raising defenses and objections must be made before a plea is entered unless the court permits otherwise—suggesting that the defendant need not be present. See, United States ex rel. Coleman v. Cox, 47 F.2d 988 (5th Cir. 1931), holding that the defendant need not be produced in order to permit the court to pass on a demurrer to the indictment. Rule 43 of the Federal Rules of Criminal Procedure is explicit in requiring his presence at arraignment, trial and sentence, suggesting again that the defendant's presence is unnecessary at pretrial motions when there is no evidence being taken and, therefore, no need to confront witnesses.

In United States v. Lynch, 132 F.2d 111 (3d Cir. 1942), cert. denied, 318 U.S. 777, 63 S.Ct. 831, 87 L.Ed. 1146 (1943) the court ruled that no constitutional right had been violated by the lack of the defendant's presence during a hearing to vacate judgment and sentence:

> "We do not understand that the right of a defendant to be present in court throughout his trial has ever been considered to embrace a right to be present also at the argument of motions prior to trial or subsequent to verdict." 132 F.2d at 113.

See also, United States v. Gradsky, 434 F.2d 880 (5th Cir. 1970), cert. denied sub nom. Roberts v. United States, 401 U.S. 925, 91 S.Ct. 884, 27 L.Ed.2d 828 (1971); United States v. Malinowski, 347 F.Supp. 347 (E.D.Pa.1972), aff'd, 472 F.2d 850 (3d Cir.) cert. denied, 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973). This circuit has even held that the presence of a defendant during a pretrial suppression hearing was not mandated by the Sixth Amendment. The defendant's absence "did not jeopardize his ability to confront witnesses testifying as to his guilt and the incidents surrounding his frisk, or hinder the effectiveness of his counsel's assistance." United States v. Bell, 464 F.2d 667 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). Even in habeas corpus matters, the prisoner need not be present for the argument of the motion to determine whether he needs to be produced for a hearing. 28 U.S.C. § 2243; United States v. Hayman, 342 U.S. 205, 222, 72 S.Ct. 263, 274, 96 L.Ed. 232, 243 (1952).

The position that the court may act prior to the defendant's surrender was recently recognized by Mr. Justice William O. Douglas, sitting as Circuit Justice on a stay application in Hughes et al. v. Thompson, Judge, 415 U.S. 1301, 94 S.Ct. 829, 830, 39 L.Ed.2d 93 (1974). He declared:

> "Under the Rules of Criminal Procedure the question of the sufficiency of the indictment 'shall be noticed by the court at any time.' Rule 12(b)(2). Whether the motion should be disposed of prior to the arraignment rests in the sound discretion of the District Court. The District Court certainly has the power to follow that course and sometimes it may be important to prevent harassment or the use of other unconstitutional procedures against the accused." (Emphasis supplied.)

Exercising the power which Justice Douglas had declared it to possess, the

district court considered the validity of the indictment, found it to be insufficient on its face, and dismissed it, although the court had not acquired jurisdiction of the person of the defendant (who may have remained outside the United States while these proceedings were taking place). *See* United States v. Hughes, No. LV 2843 BRT (D.Nev. 1974), Reporter's transcript at 97–103. *Cf.* Petition for Writ of Mandamus, Jason v. Coffrin, 74–2010 (2d Cir. 1974); Petition for Rehearing and Suggestion of Appropriateness of a Rehearing En Banc in United States v. Davies, 74–1161 (3d Cir. 1974); United States v. Barnette, 27, 807 (W.D.Ky., January 28, 1974) (order of dismissal).

To support its position that this court lacks power to consider these fugitive matters, the United States relies primarily upon two cases: Molinaro v. New Jersey, 396 U.S. 365, 366, 90 S.Ct. 498, 498–499, 24 L.Ed.2d 586, 588 (1970) and Lewis v. United States, 146 U.S. 370, 373, 13 S.Ct. 136, 137, 36 L.Ed. 1011, 1012–1013 (1892). Neither warrants abnegation of this court's jurisdiction to control its calendar.

■ *Molinaro* represents the well known proposition that an appellate court may, *in its discretion*, refuse to hear a case in which a defendant has fled the jurisdiction. *See, e. g.,* Eisler v. United States, 338 U.S. 189, 69 S.Ct. 1453, 93 L.Ed. 1897 (1949); Johnson v. Laird, 432 F.2d 77 (9th Cir. 1970); Hitchcock v. Laird, 456 F.2d 1064 (4th Cir. 1972); *cf.* Dawkins v. Mitchell, 141 U.S.App.D.C. 213, 437 F.2d 646 (1970). As Mr. Justice Murphy stated in his dissent in *Eisler,* courts should not always express their displeasure with fugitive parties by refusing to adjudicate a claim that there is no basis for the charges brought against them:

> Law is at its loftiest when it examines claimed injustice even at the instance of one to whom the public is bitterly hostile. . . . Our country takes pride in requiring of its institutions the examination and correction of alleged injustice whenever it occurs. We should not permit an affront of this sort to distract us from the performance of our constitutional duties. 338 U.S. at 194–195, 69 S.Ct. at 1456, 93 L.Ed. at 1901.

■ The dictum in *Lewis* "that, after indictment found, nothing shall be done in the absence of the prisoner," 146 U.S. at 372, 13 S.Ct. at 137, 36 L.Ed. at 1012, is not controlling. As already pointed out, it has no necessary application to motions addressed to the legal sufficiency of indictments, which can be heard in the defendant's absence.

No constitutional inhibition against court action to determine the validity of a criminal charge absent a defendant was inserted into our Constitution by its draftsmen; there was no reason to consider the issue. Contemporary common law in England condemned fugitives through the process of outlawry. Blackstone's Commentaries On The Law, Ch. XXIV, 886–888 (Gavit ed. 1941); 1 J. Chitty, Criminal Law 347 et seq. (1816). This procedure was undoubtedly well known to colonial lawyers who relied heavily on Blackstone. A determination of outlawry was made *ex parte* but was subject to highly technical rules and reversals on writ of error. At least in non-capital (non-treason and non-felony) cases, writs of error as to outlawry proceedings could be obtained by an attorney without the defendant being present, if the outlawry was before conviction. 1 J. Chitty, Criminal Law 369 (1819). This rule did not apply to treason and felony cases, apparently because there was no right to counsel in such cases at that time. It appears that a relative was permitted to object and suggest error in the process even in a felony case in the absence of a deceased defendant. *See* 4 J. Chitty, Criminal Law 238 (1816). *But cf.,* People v. Genet, 59 N. Y. 82 (Sup.Ct.1874).

The court's right to hear from counsel on behalf of a defendant on legal issues, even during the period when a defendant had no right to counsel, was established long before adoption of our own Constitution. *See, e. g.,* 1 J. Chitty, Criminal Law 408 (1816); R. v. Lilborne, 4 Howell's State Trials 1270

(1649) (counsel on legal points); R. v. Ratcliff, 18 Howell's State Trials 430 (1746). As Chitty points out (*ibid*):

> "it is certain, that any one may, as *amicus curiae,* inform the court of any error in the proceedings [of outlawry], of which they are bound to take cognizance."

## CONCLUSION

The court has an interest in clearing its docket of invalid indictments and has the power to appoint counsel authorized to make motions addressed to their sufficiency. That was the evident purpose of the September 10th order. We need not and do not hold that the appointment carried with it the authority to speak or act for the defendants on matters relating to their guilt or innocence of the offense charged.

The government's motion to set aside this court's order of September 10, 1974 is denied.

So ordered.