UNITED STATES of America, Appellant,

v.

Sidney SALZMANN, Appellee.

No. 272, Docket 76–1357.

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1976.

Decided Sept. 28, 1976.

* Of the Eastern District of New York, sitting by designation.

Edward R. Korman, Chief Asst. U.S. Atty., Eastern District of New York, Brooklyn, N.Y. (David G. Trager, U.S. Atty., Eastern District of New York, Brooklyn, N.Y.), for appellant.

Louis Lusky, New York City, for appellee.

Before KAUFMAN, Chief Judge, and FEINBERG and VAN GRAAFEILAND, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Thousands of young men in Canada, Sweden, and elsewhere, who fled from their military obligations in the Vietnam era, are now condemned by outstanding indictments to a bitter exile. The plight of these youths is a matter of serious national concern, and we can only sympathize with those who must confront the grave moral questions raised by this living remembrance of the agony of Vietnam. But although we understand Judge Weinstein's desire to contribute to the solution of this national problem, we find it unnecessary—and inappropriate—to endorse fully the broad implications of all his grounds for holding that Sidney Salzmann, a selective service offender living in Israel whom the Government made no effort to have returned for trial, was denied the speedy trial vouchsafed him by this Circuit's rules and the Sixth Amendment.

The question to be decided on this complex appeal has been narrowed, for the Government has spared us the travail of deciding all the issues raised in Judge Weinstein's voluminous opinion. It has conceded it should have responded to Salzmann's intimation that a reason for his failing to return for trial was financial inability to do so by informing him he would be provided free transportation, if necessary, back to New York. The Government also agreed that the failure to do this constituted a lack of due diligence. In this case, however, it insists we should remand for a hearing on the good faith of Salzmann's assertion that he failed to appear for trial because he lacked the necessary funds.[1] Because we believe this remand is unnecessary, we affirm on the limited ground presented by the Government's concessions.

I.

A brief summary of the relevant facts will aid in the understanding of this case. In 1969 Sidney Salzmann was a rabbinical student and enjoyed a IV–D draft deferment. During the latter part of the year, however, he moved with his wife to Israel and abandoned his studies. His draft board was duly notified of these events, and on January 20, 1970, reclassified him I–A.

In March, Salzmann was ordered to report to Jamaica, Queens, for a preinduction physical examination on May 3, 1970. Because Salzmann was abroad, however, the board rescheduled the examination for May 27 at Livorno, Italy. Salzmann failed to appear. In a letter dated June 20 the local board reminded Salzmann of his continuing obligation to report, and advised him to arrange a new date with the Army for his physical examination. Salzmann forebore responding until December 17, 1970. At that time he blamed his failure to submit to examination on "the shortage . . . of the necessary Dollars. . . ."

Salzmann's explanations apparently came too late, for on December 22, 1970, the local board ordered him to report to Fort Hamilton, New York, for induction. Several days later, in evident response to Salzmann's financial complaint, the board sent a second letter, reminding him of his obligation to report and asserting that he would have to "pay all travel expenses involved." Salzmann's reply to the induction order was immediate. On January 6, 1971, he wrote

Having just received my order to report for induction I wish to inform the Board that since I am in Israel I have no means at my disposal to appear at the Examination and Entrance Station at fort [sic] Hamilton at the time and date specified.

He then continued:

Furthermore, I wish to bring to the attention of the Board that my wife and I, upon coming to Israel, have decided to make our permanent home here. This decision was the culmination of many years of education and training in this direction and was, I believe, a perfectly rational and legitimate one on our part. We came here not with the desire to escape our former obligations and ties but, rather to enter into new ones, closer to our hearts, here in our ancient homeland, Israel.

Having made the decision to remain here I will be required in the near future to serve in the Israel Defense Forces, an act which I concider [sic] to be my personal duty as a Jew.

I therefore appeal to the Board to reconsider my case and grant me an extension until such time as I can be inducted into the Israel Defense Forces, at which time I hope my case can be closed legally.

Salzmann's local board ignored both the ambiguity concerning his intention to return if funds were available and Salzmann's fuller response. It advised him that, since he had failed to report for induction and "had no intention to comply with such obligation in the immediate future," it was referring his case to the United States Attorney for prosecution. Salzmann wrote in reply "that at no time did I assert that I have no intention of complying with my

---

1. Government's brief at 22.

obligation to report for induction." This letter, dated February 13, 1971, was forwarded to the U.S. Attorney by the local board and inserted in Salzmann's Selective Service file. By this time the file contained enough information to raise a serious question whether Salzmann was unwilling to fulfill his military obligation if his return to the United States were financed by the Government.

Nearly a year and a half later, on June 26, 1972, an indictment was filed charging Salzmann with two counts of failing to perform a duty imposed by the Selective Service Act, 50 U.S.C.App. § 462(a)—refusal to appear for physical examination and failure to report for induction. The case was scheduled to be called before Judge Weinstein August 18. Salzmann, of course did not appear. On September 25, however, he addressed a letter to Assistant U.S. Attorney Thomas R. Maher, attributing his absence to receipt of the indictment on August 17, 1972, only one day before the case was called. He continued:

> In addition to this I should mention that I am not financially equiped [sic] at the present moment to undertake a voyage of this nature.

Salzmann then proceeded to develop the themes adumbrated in his letter of January 6, 1971, to the local board.

> "My purpose in leaving the country," he wrote, "was not evading military service . . . I had been planning to move to Israel for many years. This was the aim of all my studies and training, it was my goal and purpose in life and moving to Israel was the culmination of many years of Zionist training and upbringing . . I believe that I have the basic right to live in the country of my choice and especially in Israel, which is the historic homeland of my people."

Salzmann indicated that, as a permanent resident of Israel, he expected to be called soon for that country's military service, and, he declared,

> When called I will serve and it is my sincere hope that upon serving in the Israel Defense Forces my status will change as regards my eligibility for, and responsibility to the American Army. Since the relations between our two countries are quite friendly I am sure that my service here will in no way be looked upon as subversive but rather as an alternative.

Salzmann concluded:

> It is in the light of the abovementioned facts that I come to you today with a sincere request that you do all in your power to have the charges against me dropped.

The record does not reflect any response by the Government to Salzmann's explanation or plea.[2] Nor did the Government make any subsequent effort to obtain Salzmann's return for trial. The indictment languished for nearly two years, until Judge Weinstein decided to clear his docket of selective service cases. His effort has resulted in this appeal.

Initially, Judge Weinstein appointed Professor Louis Lusky counsel for all of the 26 fugitive draft evaders whose cases were on the Judge's calendar. Even then Judge Weinstein displayed a lively interest in the general problem of Vietnam era exiles, for the primary task assigned to Professor Lusky was to weed out defective indictments so that draft evaders with strong defenses would not be coerced into alternate service under President Ford's amnesty plan. See United States v. Lockwood, 382 F.Supp. 1111, 1113–15 (E.D.N.Y.1974). Accordingly, the Government was ordered to make available to Professor Lusky the fugitives' Selective Service files. United States v. Lockwood, 386 F.Supp. 734, 739–41 (E.D.N.Y.1974). We directed Judge

---

2. At oral argument the Government asserted that a letter was sent advising Salzmann that service in the Israeli army did not constitute a defense to the charges against him. The Government admits, however, that it ignored Salzmann's assertion of financial inability to return for trial, although the Selective Service file in its possession indicated that lack of money was one reason, at least, for Salzmann's failure to report for examination and induction.

Weinstein to vacate this order, however, because Mr. Lusky was not authorized by any of the defendants to represent him. *United States v. Weinstein*, 511 F.2d 622, 628–29 (2d Cir.) *cert. denied, Austin v. United States*, 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975). But we expressly stated we did "not intend to preclude Judge Weinstein from entertaining motions on behalf of fugitive defendants who have agreed that Professor Lusky or any other attorney represent them." *Id.* at 629.

Salzmann subsequently appointed Professor Lusky to represent him. On September 19, 1975, he moved to dismiss the indictment on the ground that he had been denied a speedy trial. Judge Weinstein reserved decision. In the ensuing months numerous letters and memoranda were filed in support of and in opposition to the motion. On July 16, 1976, Judge Weinstein dismissed the charges on the following grounds:

(1) The Government did not comply with the various speedy trial plans in effect since Salzmann's indictment [3] because it failed to exert due diligence to secure Salzmann's return for trial;

(2) The delay in bringing Salzmann to trial violated his constitutional right under the Sixth Amendment to a speedy trial;

(3) The delay both in presenting the accusation to the grand jury and in commencing trial was unnecessary and prejudicial, and justified dismissal of the indictment under Fed.R.Crim.P. 48(b); [4]

(4) The provision of the Selective Service Act, 50 U.S.C.App. § 462(c),[5] requiring trial of draft cases as expeditiously as possible, mandates dismissal of the indictment.

The Government has admitted, for purposes of this appeal, that its failure to offer Salzmann travel funds in the face of his continued avowal of poverty constituted a lack of due diligence under the speedy trial rules, if, indeed, the appellant lacked the necessary travel funds. We believe that the indictment was properly dismissed in light of this concession, and accordingly, it is unnecessary to decide the remaining questions raised by Judge Weinstein's decision.

## II.

The last decade has brought an increasing awareness of the vital importance, to both society and the accused, of a speedy trial. The criminal defendant's interest in prompt disposition of his case is apparent and requires little comment. Unnecessary delay may make a fair trial impossible. If the accused is imprisoned awaiting trial, lengthy detention eats at the heart of a system founded on the presumption of innocence. Where a defendant is not detained prior to trial, the mere pendency of the indictment for a substantial period can cre-

---

**3.** Two sets of speedy trial rules were in effect in the Eastern District between the time of Salzmann's indictment on June 26, 1972, and his motion for dismissal on September 25, 1975. The Second Circuit Rules Regarding Prompt Disposition of Criminal Cases were promulgated on January 5, 1971, and remained in effect until April 1, 1973. They were superseded by the Eastern District Plan for Achieving Prompt Disposition of Criminal Cases, adopted under Fed.R.Crim.P. 50(b), which was in force until September 29, 1975.

**4.** Rule 48(b) provides:
 If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

**5.** 50 U.S.C.App. § 462(c) provides:
 The Department of Justice shall proceed as expeditiously as possible with a prosecution under this section, or with an appeal, upon the request of the Director of Selective Service System or shall advise the House of Representatives and the Senate in writing the reasons for its failure to do so.
 It should be noted that by its terms the statutory command operates solely upon request of the Selective Service director. Although the question is not free from doubt, it appears that a local board's mere referral of a case for prosecution does not trigger this provision. *See United States v. Golon*, 511 F.2d 298, 301–02 (1st Cir.), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *United States v. Pereira*, 524 F.2d 969, 972 (5th Cir. 1975).

ate great hardship. It may "disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and friends." *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). Moreover, we cannot emphasize sufficiently that the public has a strong interest in prompt trials. As the vivid experience of a witness fades into the shadow of a distant memory, the reliability of a criminal proceeding may become seriously impaired. This is a substantial price to pay for a society that prides itself on affording fair trials. In addition, the accelerating crime rate and emergence of procedures to make the criminal process more evenhanded have placed heavy burdens on court dockets. It is essential, therefore, that the courts rise to the challenge by avoiding the sort of fatal delay "that undermines the law's deterrent effect by demonstrating that justice is not swift and certain but slow and faltering." President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 154 (1967).

In 1971 this Circuit responded to the challenge by promulgating Rules Regarding Prompt Disposition of Criminal Cases. (The "Second Circuit Rules"). Unlike the subsequent Speedy Trial Act of 1974, 18 U.S.C. § 3161 *et seq.*, the Second Circuit Rules

focused principally on the prosecutor's responsibility to bring his cases to trial. The heart of the 1971 scheme was Rule 4:[6]

> In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, or within the periods as extended by the district court for good cause under rule 5, and if the defendant is charged only with non-capital offenses, then, upon application of the defendant or upon motion of the district court, after opportunity for argument, the charge shall be dismissed.

Eight periods of excludable delay were enumerated in Rule 5. Of these, only Rule 5(d) is relevant to the case before us.[7] It excluded:

> The period of delay resulting from the absence or unavailability of the defendant . . . A defendant should be considered unavailable whenever his location is known but his presence for trial cannot be obtained by due diligence.

The Government apparently concedes it was not ready for trial within six months, as required by Rule 4, because it could not produce the defendant, Salzmann.[8] The

---

**6.** Rule 4 of the Eastern District Plan does not differ in any material respect from its counterpart in the Second Circuit Rules:

4. *All Cases: Trial Readiness and Effect of Non-Compliance.* (emphasis added)

In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or of a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, and if the defendant is charged only with non-capital offenses, the defendant may move in writing, on at least ten days' notice to the government, for dismissal of the indictment. Any such motion shall be decided with utmost promptness. If it should appear that sufficient grounds existed for tolling any portion of the six-months period under one or more of the exceptions in Rule 5, the motion shall be denied, whether

or not the government has previously requested a continuance. Otherwise the court shall enter an order dismissing the indictment with prejudice unless the court finds that the government's neglect is excusable, in which event the dismissal shall not be effective if the government is ready to proceed to trial within ten days.

**7.** Rule 5(d) of the Eastern District Plan is in all material respects identical to Rule 5(d) of the Second Circuit Rules.

**8.** The Government asserts in its brief, at 18–20, apparently on the assumption that the trial readiness requirement is satisfied if the prosecution is prepared to proceed as soon as the defendant presents himself, *that it was not required to file a notice of trial readiness while Salzmann was a fugitive.* If the Government's interpretation of the six-month limitation period were correct, however, it would have been

principal question confronting us, therefore, is whether Salzmann was "unavailable" within the meaning of Rule 5. We hold that as the question has been posed by the Government, he was not.

We might have hesitated to decide that Salzmann's vague reference to financial problems in his September 25 letter to Assistant U.S. Attorney Maher, a letter whose dominant purpose was to convince Maher "to do all in [his] power to have the charges against [Salzmann] dropped," would have been sufficient to require the Government to offer to pay Salzmann's way back to the United States. And, indeed, Judge Weinstein found Salzmann had made no serious effort to return to stand trial. Due diligence must be a rule of prudence and not a trap for an unwary prosecutor in a politically unattractive case.

But, the Government explicitly concedes, for reasons it considers prudent, that in this case it should have informed Salzmann that funds would be made available for his return to the United States, if his financial situation warranted. It would be anomalous for us to require a lesser standard of diligence than the Government is willing to impose upon itself.

Moreover, in the context of this difficult and intricate case, the Government's position is not unreasonable. Salzmann's reference to financial problems in his letter to Maher merely sounded anew a constantly recurring note in his correspondence. As early as January 6, 1971, Salzmann told his local board he could not return to Fort Hamilton for induction because he lacked the means to do so. And, significantly, when the local board interpreted Salzmann's January 6 letter as indicating a lack of intention to fulfill his military obligation, Salzmann promptly retorted, in his letter of February 13, "at no time did I assert that I have no intention of complying with my obligation to report for induction."

All of Salzmann's correspondence was, of course, in the possession of the Government. Read as a whole, it suggests at least the possibility that Salzmann might return for trial if the Government made him aware it was ready to finance his journey to the United States.

We should emphasize that the essence of the Government's duty was to inquire into an equivocal situation, and define it. At virtually no cost to the Government, the prosecution might have put Salzmann's good faith to the proof and have avoided subsequent controversy. This consideration substantially undercuts the Government's argument that we should remand this case for a determination whether Salzmann's financial situation truly prevented him from returning to the United States for trial. Inherent in a rule of diligence in the speedy trial context is the responsibility to clarify an ambiguous situation as promptly as possible. It would be anomalous to permit that obligation to be disregarded by the Government and for us to proceed years later to order a necessarily speculative *post hoc* hearing into the rather indistinct facts that required clarification even then.

This argument is given greater force by the circumstances of this case. There is no objective standard by which we can determine in 1976 whether Salzmann might have returned for trial had the United States paid or offered to pay for his travel in 1972. Moreover, since periods of unavailability are excluded from the calculation of the six months trial readiness deadline, it would be necessary for the Court to examine the state of Salzmann's finances over the course of more than three years before it could decide whether the total period to be excluded was appropriate and sufficient to relieve the United States of its duty to be ready for trial. Surely the purpose of the speedy trial rules, to promote the efficient and prompt disposition of criminal cases, would be frustrated by permitting the

unnecessary to provide specially in Rule 5(d) for absent and unavailable defendants. At oral argument the Government wisely retreated from its position, and in conceding that the indictment was properly dismissed if Salzmann

was truly incapable of bearing the expense of returning for trial, it implicitly admitted that it was not ready to proceed within the six-month time period.

Government to seek today to avoid the consequences of its conduct between 1972 and 1975.

### III.

Having decided that the Government's failure to notify Salzmann of the availability of funds to finance his return for trial constituted a lack of due diligence, we need not determine whether the United States should have tried to prevail upon Israel to deport him. But, in view of the Government's apparent policy not to seek the return of selective service offenders, an expression of our views regarding Judge Weinstein's determination that the Government's diplomatic efforts fell short of due diligence may provide clarification of an issue likely to arise in subsequent cases.

Of course, deportation unjustified by the law of the refuge country is nothing more than a disguised kidnapping, an action Salzmann rightly deplores.[9] And there is nothing before us to indicate Salzmann was deportable under Israeli law. Unlike the case of Meir Lansky discussed in the briefs, Salzmann was not a "person with a criminal past, likely to endanger the public welfare." See Law of Return, § 2(b)(3), reprinted in Klein, *The Lansky Case,* 8 Israel L.Rev. 286, 287 (1973). Nor was he engaged in anti-Jewish activity or likely to endanger Israel's security. See Law of Return, §§ 2(b)(1), 2(b)(2), in *Klein, supra,* at 287. There was simply no basis under the Law of Return for expelling Salzmann.

 We would not, moreover, venture to say that a considered refusal on the part of the Government to seek return of selective service offenders violates standards of due diligence, in those instances where no

right of extradition exists by treaty. As we have noted, due diligence is a rule of prudence. And Judge Weinstein recognized in an earlier incarnation of this case, that given the antipathy both within and beyond our borders to the Vietnam war, "pressing strenuously for extradition [in draft cases] might have seriously exacerbated feelings of hostility both at home and abroad." *United States v. Lockwood,* 386 F.Supp. 734, 737 (1974), mandamus granted *sub nom. United States v. Weinstein,* 511 F.2d 622 (2d Cir.) *cert. denied,* 422 U.S. 1042 (1975). And, as the controversy surrounding the *Lansky* case demonstrated, deportation of a Jew from Israel—especially a committed Zionist like Salzmann—risks inflaming Israeli public opinion. Where the American right to demand extradition is established by treaty, considerations of foreign policy might well be subordinated to speedy trial. Where the United States must rely solely on comity, however, diplomatic factors may properly be taken into account in determining what diligence is due. We are unpersuaded that under these circumstances, the United States was obliged to seek Salzmann's return by means dehors the extradition treaty, and thus risk serious diplomatic embarrassment.

The appellant urges that, even if the Government is not bound to exhaust every means not plainly futile to obtain the return of draft offenders, it must at least make a considered judgment of policy to forego the assiduous efforts otherwise required. The record before us is singularly barren of evidence regarding what policy decisions have been made, by whom, and by what means. We know only that, according to a Justice Department official,[10] the

9. Appellee's Brief at 18. *Cf. United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *United States v. Toscanino,* 500 F.2d 267, rehearing en banc denied, 504 F.2d 1380 (2d Cir. 1974).

10. An affidavit was filed by the Government's principal authority, one Murray R. Stein, an attorney for the Government Regulations and Labor Section of the Justice Department's Criminal Division. Mr. Stein, as part of his

official duties, is responsible for making requests to the Department of State to seek extradition from foreign governments. His affidavit, dated June 2, 1976, said in relevant part:

The policy of this Government is not to make requests for the extradition of fugitives for whom we already know that surrender is impossible to obtain because the offense for which they were indicted is obviously not an enumerated treaty offense. Thus, no request has been made upon the Israeli Government for the extradition of fugitives who have been

policy of the Government is not to make requests for the extradition of fugitives where extradition is impossible because the offense is not enumerated in the treaty. There is no indication whether this was the United States policy in 1972, when Salzmann was indicted. Nor does this policy preclude requests for surrender not based on the extradition treaty. Scarcely a glimmer illumines the decisions of our Government concerning the zeal with which Vietnam era exiles are to be sought in their countries of asylum.

It is evident that on this record we cannot fully evaluate Salzmann's contention that no valid policy reasons supported the Government's general failure to seek the return of draft offenders. We will not speculate what procedures will assure us that the failure to pursue selective service fugitives is the product of choice, not inertia. But we must add, that our traditional deference to the judgment of the executive department in matters of foreign policy, *see First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), drastically limits the scope of our review, substantive and procedural. In any event, because we affirm on other grounds, we need not explore this issue further.

## IV.

▮ Compassionate yet fair treatment of Vietnam era exiles can only be achieved by the imagination and energy of the political branches of government. Our task in this case is much more limited. It is to determine whether the Government's failure to be ready for trial within six months of Salzmann's indictment was excused by Salzmann's "unavailability." The Government concedes that it did not exercise the due diligence required by our rules to ob-

tain the presence of the defendant. It admits a duty to respond to Salzmann's claims of impecuniousness by notifying him funds would be made available to finance his return to the United States. It asserts merely that we should remand this case to Judge Weinstein for a hearing whether Salzmann actually lacked the financial means at that time to return. Prompt and efficient administration of justice requires us to reject this request for a hearing, since its effect would be to condone the Government's failure to discharge its duty in 1972 and replace it with a speculative post hoc proceeding. Accordingly, we affirm.

FEINBERG, Circuit Judge (concurring):

While I agree with the holding of Chief Judge Kaufman's thoughtful opinion, I would not rest decision here merely on the Government's concession that it should have notified Salzmann that it would provide him transportation home. Even if Salzmann had never mentioned his financial problem, I would hold that because the Government did nothing to bring him to trial, it did not exercise due diligence under the speedy trial rules then in effect.[1] The following is a brief explanation of these views.

Allowing a defendant who is out of the jurisdiction to take advantage of its speedy trial rules may seem incongruous at first. We do not allow a fugitive to prosecute an appeal. *Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970) (per curiam); *United States v. Sperling,* 506 F.2d 1323, 1345 n. 33 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Why should we allow a fugitive or others beyond the court's jurisdiction to rely upon the speedy trial rules and secure dismissal of an indictment at the trial level?[2] There are several answers.

---

indicted for violation of our selective service statutes.

Israeli law, according to Mr. Stein, forbids extradition for offenses not enumerated in the extradition treaty.

1. The rules are identified in footnote 3 of Chief Judge Kaufman's opinion.

2. I doubt whether Salzmann is, in fact, a fugitive, although he is in a foreign country. His residence is known, he has made no attempt to hide it, and he has been in communication first with the local draft board and then with the United States Attorney.

Most important, the public interest in prompt trials, which Chief Judge Kaufman's opinion emphasizes, is strong enough to suggest that the Government attempt to secure a defendant's presence for trial even if he is outside the jurisdiction. Also, and for this reason, the speedy trial rules place the burden on the Government to be ready for trial and specifically require diligent efforts to obtain the presence of an absent defendant like Salzmann. In addition, our prior ruling in *United States v. Weinstein,* 511 F.2d 622, 629 (2d Cir.), *cert. denied,* 422 U.S. 1042 (1975), which is the law of the case, made clear "that we do not intend to preclude Judge Weinstein from entertaining motions on behalf of fugitive defendants who have agreed that Professor Lusky or any other attorney represent them." While this is general language and the panel may have had other types of motions in mind, the language obviously includes speedy trial motions on behalf of absent defendants. In short, an absent defendant may invoke the speedy trial rules.

The rules, however, provide that the six-month period in which the Government has to be ready for trial may be tolled if the defendant is "unavailable" and

> A defendant should be considered unavailable whenever his location is known but his presence for trial cannot be obtained by due diligence.[3]

Thus, if the Government exercises "due diligence" to obtain a defendant's presence but is unsuccessful in doing so, it is not prejudiced. To answer the question posed above, then: A true fugitive, whose location is unknown, or who is successfully resisting government efforts to bring him into the jurisdiction, will not be able to obtain dis-

missal of an indictment.[4] This is as it should be. Otherwise, the courts would be sanctioning the playing of games by fugitives.

For the Government to protect itself here, however, it must show that it has exercised "due diligence." Yet, it made no effort to obtain Salzmann's presence. The Government tells us that after it notified Salzmann that he had been indicted and then replied to Salzmann's letter, dated September 25, 1972, by advising him that the charges would not be dropped, the prosecutors did nothing further. How can we say that this inaction amounted to "due diligence"? *Cf. United States v. McConahy,* 505 F.2d 770 (7th Cir. 1974). *See also United States v. Estremera,* 531 F.2d 1103, 1107–08 (2d Cir. 1976), where the panel assumed that had deportation proceedings not been pending in Canada, the Government would have had to request extradition to qualify as diligent.

The question immediately arises: What should the Government have done? Judge Weinstein found that it should have requested Israel's cooperation even though the extradition treaty does not cover Salzmann's alleged offense. The judge made this finding after taking judicial notice of "a reasonable possibility that Israel would have cooperated in obtaining Salzmann's return had it been asked to do so." Salzmann's counsel at oral argument stated that we need not go that far. Counsel's position is that the prosecuting arm of the Government at least had to ask the State Department in 1972 to inform Israel that Salzmann, a United States citizen, resided there and was wanted for trial in this country.[5] This seems a reasonable position

---

**3.** Rule 5(d), E.D.N.Y. Plan for Achieving Prompt Disposition of Criminal Cases (1973). Rule 5(d) of the Second Circuit's Rules Regarding Prompt Disposition of Criminal Cases contained identical language.

**4.** Cf. Speedy Trial Act of 1974 § 101, 18 U.S.C. § 3161(h)(3)(B) (Supp. V, 1975), which provides, in part:

> . . . a defendant . . . shall be considered unavailable whenever his whereabouts are known but his presence for trial

cannot be obtained by due diligence or he resists appearing at or being returned for trial.

**5.** If the State Department had responded that it felt a request to Israel would be unavailing or undesirable, that representation could, of course, have been presented in opposition to Salzmann's speedy trial motion.

to me, although it is not necessary to decide whether such action alone would amount to due diligence, because the Department of Justice failed to take even that limited step. The Government argues that a request to Israel would have been fruitless and embarrassing, relying on an affidavit to that effect by Murray A. Stein, an employee of the Department of Justice.[6] But the affidavit was given in June 1976, and a request would have to have been made in the fall of 1972 to show due diligence. Also, I doubt that the prosecutor, who has the burden of showing due diligence, can rest only upon an affidavit of another Justice Department attorney to establish that a request to Israel by the Department of State would have been fruitless or embarrassing.[7] In addition, Judge Weinstein found that there was a reasonable possibility of Israel's cooperation. While I share the reluctance of my brothers to speculate on how to resolve such an issue in another case, on this record the Government simply has not met its burden.

In sum, since the Government did nothing here to obtain Salzmann's presence for trial, it failed to demonstrate the "due diligence" required to toll the six-month period under the speedy trial rules. The indictment, therefore, was properly dismissed.

6. See footnote 10 of Chief Judge Kaufman's opinion for a fuller identification.

7. Even if the Government had sufficiently proved that failure to seek return of selective service violators was a conscious policy to avoid embarrassment, the question would still remain whether its own considered choice of inaction insulates it under the speedy trial rules. *See Alderman v. United States,* 394 U.S. 165, 183–84, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Reynolds,* 345 U.S. 1, 12, 73 S.Ct. 528, 97 L.Ed. 727 (1953).