**UNITED STATES of America, Appellee,**

v.

**Griselda BLANCO,**
**Defendant–Appellant.**

**No. 1187, Docket 85–1423.**

United States Court of Appeals,
Second Circuit.

Argued June 17, 1988.
Decided Nov. 10, 1988.

Franklin B. Mandel, New York City, for defendant-appellant.

Steven A. Standiford, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., Linda Imes, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

On April 30, 1975, an indictment charging appellant Griselda Blanco and 37 others was filed in the United States District Court for the Southern District of New York and the case was assigned to Judge John Cannella. The indictment charged the defendants with conspiring to manufacture, import into the United States, and distribute cocaine. By January 1976, twelve of the conspirators had been prosecuted and convicted, and two others had pleaded guilty.

When the indictment was returned in April, 1975, Blanco, a Colombian citizen, was living in Colombia. In May, 1975, the district court issued a warrant for her arrest. That year, Charles Cecil, a special agent of the Drug Enforcement Administration ("DEA"), began investigating Blanco's whereabouts. By 1977, Cecil had learned of her address in Colombia through an informant and he took several measures to keep track of Blanco's whereabouts and to discover whether she entered the United States.

In Colombia, Blanco travelled under a false name and carried a passport bearing that name. In 1977, Cecil's informant told him that Blanco said she would not travel to the United States because she was "wanted" there. Cecil urged the informant to try to persuade Blanco to travel to Costa Rica, a nation from which she might have been extradited. In 1977, Cecil also asked Blanco's lawyer to try to persuade her to surrender to United States authorities. He forwarded her alias to United States Customs. He checked American consulates in Colombia to see whether a visa had been issued to Blanco. In 1977, when he heard that Blanco may have been shot in Miami, he requested that DEA agents search Miami hospitals for a gunshot victim fitting Blanco's description. In 1980, when Cecil heard that Blanco may have been killed in Miami, he asked U.S. Customs officials to check bodies being shipped to Colombia for a body fitting Blanco's description.

After a warrant for Blanco's arrest was issued on October 4, 1974, the DEA issued

a fugitive report on Blanco and listed it in the National Criminal Information System and the Treasury Enforcement Communications System. The DEA also put Blanco's name on passport and visa "lookouts" to search for her name and description.

The government did not request the extradition of Blanco from Colombia. According to the trial testimony of John Harris, a senior trial lawyer in the International Affairs Office of the Justice Department's Criminal Division, before 1982 extradition of Colombian citizens to the United States was governed by an 1888 treaty which did not require Colombia to extradite its citizens to the United States. He testified that when faced with extradition requests, the Colombian government looked to domestic Colombian law, which prohibited Colombia, apart from the treaty, from surrendering its citizens to another country. In light of Colombia's policy of denying extradition requests for the surrender of its citizens, the United States before 1982 discouraged prosecutors from submitting such requests to Colombia. Nonetheless, according to Harris, during this pre–1982 period at least two such extradition requests were made and Colombia denied each of them.

In 1982, a new extradition treaty between the United States and Colombia took effect. According to Harris, this treaty required Colombia to surrender drug smugglers to the United States. However, Harris testified, the President of Colombia announced that he did not intend to enforce the new treaty. Harris further testified that, because of the President's position, before April 1984, the United States had no chance of securing the extradition of Colombian citizens. It apparently is undisputed that the first Colombian citizens extradited to the United States under the 1982 treaty were not surrendered until January 1985.

On May 30, 1984, DEA Special Agent Robert Palombo spotted Blanco in Newport Beach, California. Palombo was conducting an investigation of suspected drug smuggling by Blanco's sons when he saw Blanco deliver cash to a DEA informant, in an attempt to launder money. Palombo later testified, at a hearing on November 30, 1987, that the government chose not to arrest Blanco then because to do so would have jeopardized both the life of the DEA informant and the investigation of Blanco's sons. The district court found this testimony credible.

Between May and September 1984, the government did not know where Blanco was located. In September 1984, Blanco was again seen delivering cash to the DEA informant. Between September 1984 and February 17, 1985, the DEA had only intermittent information about Blanco's whereabouts. During this period, Blanco used a false name and avoided disclosing to the informant her telephone number and address. After intensifying its surveillance and investigation of her, the DEA finally arrested Blanco in Irvine, California, on February 17, 1985. Blanco gave a false name to the DEA agents who arrested her and she was found to be carrying false identification papers.

Blanco's jury trial before Judge Cannella commenced on June 25, 1985 and ended July 9, 1985. At trial, the prosecution relied heavily on the testimony of Carmen Caban, a former drug dealer turned government witness. Caban testified at length about the operations between 1972 and 1975 of the cocaine importing ring in which Blanco allegedly participated. On cross-examination of Caban, Blanco's defense counsel inquired about Caban's cooperation agreement with the government, about a grant of immunity for Caban's past crimes, about the government's assistance in vacating a state conviction of Caban, and about financial help the government gave her. Counsel also inquired about Caban's extensive career as a drug dealer and her many past acts of lying, stealing, and defrauding. However, Judge Cannella prevented defense counsel from asking Caban about her alleged participation in a murder, ruling that the prejudice caused by testimony about this matter would far outweigh its probative value. The district judge also prevented Blanco's counsel from cross-examining another government witness, Glo-

ria Caban, Carmen's sister, about her alleged participation in the same murder.

The trial judge allowed the prosecution to introduce evidence that at the time of her arrest Blanco was carrying false identification papers and that she gave the arresting officers a false name. Judge Cannella instructed the jury that this evidence need not necessarily show consciousness of guilt and he suggested to the jury reasons why an innocent person might conceal her identity. In his charge to the jury, the judge told the jury that it had the responsibility of deciding whether Blanco's concealment of her identity indicated consciousness of guilt.

To corroborate Caban's testimony about the existence of a drug importing conspiracy, the prosecution presented evidence of arrests of drug couriers, seizures of drugs, and conversations between suspected drug dealers which occurred between 1972 and 1975. For example, the prosecution introduced evidence of the 1972 arrest of one Antonio Romero, who was apprehended at Kennedy Airport trying to smuggle cocaine into the United States by concealing it in a dog cage. In his charge to the jury, Judge Cannella explained that to find Blanco guilty of conspiracy the jury had to find four elements: an agreement, an overt act, a violation of law, and Blanco's knowing participation. He told the jury:

> It may be that you don't find there is any conspiracy at all, or that there is [sic] a number of conspiracies rather than one conspiracy, because the government must prove here there is one conspiracy, namely, that the drugs were gotten in Columbia [sic], brought in through Miami, or other places, and then brought to New York. That is the conspiracy that is charged, and that is the conspiracy they must prove, a single conspiracy....

The jury returned a verdict of guilty on one count of conspiracy to manufacture, import into the United States, and distribute cocaine. Following Blanco's conviction, the district court held a hearing on Blanco's motion to dismiss the indictment on the grounds that she had been denied a speedy trial. The district court denied this motion

on November 6, 1985, finding that the delay was of Blanco's own making. Two days later, the court sentenced Blanco to fifteen years in prison and fined her $25,000. Blanco appealed. On December 23, 1985, this court remanded the case for a new hearing on the speedy trial issue, following the unsealing of the government's *ex parte* affidavits relating to the DEA's 1984 investigation in California of Blanco's sons. On January 26, 1988, the district court again denied Blanco's motion to dismiss the indictment, holding that the government's delay in arresting Blanco in California was justified. This appeal followed.

Blanco argues that the government violated her right to a speedy trial under the sixth amendment, under Fed.R.Crim.P. 48(b), and under this Circuit's former rules on the prompt disposition of criminal cases and that, consequently, the indictment should be dismissed. Alternatively, Blanco argues that she was denied a fair trial because of Judge Cannella's evidentiary rulings and she seeks a reversal of her conviction and a new trial. For the reasons stated below, we affirm.

## DISCUSSION

*Speedy Trial Issue*

Under the sixth amendment, all criminal defendants have a right to a speedy trial. In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court identified the four familiar factors that must be considered to determine whether a defendant's right to a speedy trial has been violated: (1) the length of the delay between the defendant's indictment and trial, (2) the reason for the delay, (3) when the defendant asserted the right, and (4) the prejudice defendant suffered due to the delay. *Id.* at 530, 92 S.Ct. at 2192.

Our first inquiry must be into the length of the delay. A long delay between indictment and trial is presumptively prejudicial to the defendant and triggers an inquiry into the other three *Barker* factors. *See United States v. Loud Hawk*, 474 U.S. 302, 314, 106 S.Ct. 648, 655, 88 L.Ed.2d 640

(1986). The period between Blanco's indictment on April 3, 1975 and the beginning of her trial on June 25, 1985 exceeded ten years. Such a long delay is presumptively prejudicial and thus triggers an inquiry into the other three factors. *See Rayborn v. Scully,* 858 F.2d 84, 89 (2d Cir.1988).

■ The crux of this case turns on the reason for the delay. A defendant's claim that the government violated her right to a speedy trial is seriously undermined when the defendant, and not the government, is the cause of the delay. *See Rayborn* at 90; *United States v. Deleon,* 710 F.2d 1218, 1222 (7th Cir.1983); *United States v. Rodriguez-Restrepo,* 680 F.2d 920, 922 (2d Cir. 1982). An analysis of the events which transpired herein reveals that Blanco must bear the responsibility for the lengthy delay between her indictment and trial.

■ It is clear that the government has a constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly. *See Smith v. Hooey,* 393 U.S. 374, 383, 89 S.Ct. 575, 579, 21 L.Ed.2d 607 (1969); *United States v. Diacolios,* 837 F.2d 79, 82 (2d Cir.1988). We conclude that the government fulfilled that duty in this case. Before 1984, when Blanco was living in Colombia, the government met its duty of due diligence by having its agent, Charles Cecil, investigate Blanco's whereabouts and attempt to keep track of her through an informant. The government also made considerable efforts from the time a warrant was issued for her arrest in 1974 until the time she was spotted in California in 1984 to detect whether Blanco had entered the United States. The fugitive report on Blanco filed with the National Criminal Information System and the Treasury Enforcement Communications System, the passport and visa "lookouts" filed by the DEA for someone of her name and description, the search for her in Miami hospitals in 1977, and the search for her body in 1980 are all examples of the government having mounted diligent efforts to meet its constitutional responsibility.

Under the circumstances described above, the government had no duty to request the extradition of Blanco from Colombia, either before or after the new United States–Colombia extradition treaty took effect in 1982. Due diligence does not require the government to pursue goals that are futile. *Diacolios,* 837 F.2d at 83. Before 1982, the existing United States–Colombia extradition treaty did not require Colombia to surrender its citizens under the treaty and the record evidence reveals that, in any event, the Colombian government had a policy of denying extradition requests involving its citizens. It seems clear that, before 1982, a request by the government for the extradition of Blanco would have been futile. The futility of such a request is confirmed by evidence that, on at least two occasions before 1982, extradition requests made to Colombia for the surrender of Colombian citizens were denied.

Nor did the government's failure to request Blanco's extradition after 1982, when the new treaty requiring Colombia to surrender drug smugglers to the United States became effective, constitute a breach of the government's duty of due diligence since the President of Colombia had announced that he would not enforce the new treaty. According to the testimony of the witness from the U.S. Department of Justice, John Harris, any extradition requests made before April 1984 would have been futile. This being true, the government had no duty to make such a request. *Cf. United States v. Walton,* 814 F.2d 376, 379 (7th Cir.1987) (in Speedy Trial Act case, government was diligent, despite failure to request extradition of defendant held in Swedish prison when Swedish officials made clear that they would not grant an extradition request).

Blanco argues that, apart from extradition, the government should have tried to either lure her from Colombia or seize her there. She argues that had she been seized in Colombia by U.S. agents she would have had no grounds to complain that the United States lacked jurisdiction over her, so long as Colombia consented to the seizure and she was not physically abused. *See United States ex rel. Lujan*

*v. Gengler,* 510 F.2d 62, 68 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

The government did, in fact, propose that Blanco be lured from Colombia. DEA agent Cecil urged his informant to try to persuade Blanco to travel to Costa Rica, from whence she might have been extradited to the United States. Cecil also asked Blanco's lawyer to try to persuade Blanco to surrender.

 The government, however, had no duty to seize Blanco in Colombia. The United States has no right to enforce its laws in another country without that country's consent or acquiescence. Apropos consent, see Restatement (Third) of the Foreign Relations Law of the United States § 432(2) (1986). Since Colombia had a policy of refusing to extradite its citizens to the United States, the government reasonably could assume that Colombia would not have consented to Blanco's seizure, and a seizure of Blanco without Colombia's consent would likely have been considered a violation of international law. *See FTC v. Compagnie de Saint–Gobain–Pont–A–Mousson,* 636 F.2d 1300, 1316 (D.C.Cir. 1980) ("If a state should enforce a rule which it does not have jurisdiction to enforce, it violates international law...."); Restatement (Third), *supra,* § 432 comment (1986) ("If a state's law enforcement officials exercise their functions in the territory of another state without the latter's consent, that state is entitled to protest and, in appropriate cases, to receive reparation from the offending state."). While the government's illegal seizure of a defendant in another country does not, standing alone, automatically deprive the federal courts of jurisdiction over that defendant, *see Lujan,* 510 F.2d at 68, it surely does not follow that the government had a duty to make such a seizure.

 Finally, Blanco argues that the government breached its duty to act with due diligence when it waited nine months to arrest her after first observing her in California on May 30, 1984. The district court found that between May 30, 1984 and the day of Blanco's arrest, the government either did not know where Blanco was, or, when it did know, could not have arrested her without jeopardizing both the life of a government informant and the success of an investigation into suspected drug smuggling by Blanco's two sons. The government may justifiably delay arresting a defendant when the arrest may cause co-defendants to flee. *See United States v. Muse,* 633 F.2d 1041, 1044 (2d Cir.1980) (unsealing of indictment past statute of limitations period), *cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981); *United States v. Ciraulo,* 486 F.Supp. 1125, 1129 (S.D.N.Y.1980) (claim that delay caused due process violation). Avoiding risk to an informant's life and not jeopardizing an investigation constitute at least as sufficient a justification for delaying an arrest as avoiding the flight of a co-defendant as in *Muse.* We therefore conclude that the government's delay in arresting Blanco in California was not a violation of its duty of due diligence.

While the government made diligent efforts to bring Blanco to trial, Blanco sought to avoid apprehension and prosecution. The district court had little doubt, based on Blanco's use of an alias and the fact that many of her close associates and co-conspirators were convicted in 1974, that Blanco knew of the indictment. Blanco's likely awareness of the existence of the indictment is confirmed by the fact that Cecil's informant told him that Blanco said she would not travel to the United States because she was "wanted" here. Nonetheless, on appeal Blanco insists that she did not know of the indictment. The district court found that she *did* know of the indictment and since we do not believe this finding was clearly erroneous, we are bound to accept it.

Despite her knowledge of the outstanding indictment, Blanco chose to become a fugitive. A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges. *United States v. Schreiber,* 535 F.Supp. 1359, 1363 (S.D.N.Y.1982). Blanco clearly made no effort to return to

the United States to face charges. Further, her use of a false name and other evasive techniques while in California between September 1984 and February 1985 supports the government's contention that before she was arrested Blanco had no interest in a trial, speedy or otherwise.

Blanco argues that she was not a fugitive, relying on a footnote in Chief Judge Feinberg's concurrence in *United States v. Salzmann*, 548 F.2d 395, 403 n. 2 (2d Cir. 1976). In this footnote, Chief Judge Feinberg wrote that he doubted whether defendant Salzmann was a fugitive when his address in Israel was known, when he made no attempt to hide it, and when he was in communication with the United States Attorney. *Id.* at 403 n. 2. Salzmann also suggested to the government that he would return to the United States to face prosecution if the government would finance his trip. *Id.* at 401. Blanco's case is easily distinguished from Salzmann's. Although the government knew Blanco's address in Colombia, Blanco did not live openly. She travelled under a false name and carried a false passport. She was not in communication with the government, nor did she ever suggest that she would be willing to return to the United States to face prosecution.

■ Coming from a former fugitive, Blanco's claim that her right to a speedy trial was denied carries almost no weight. As Chief Judge Feinberg wrote in *Salzmann:*

> A true fugitive, whose location is unknown, or who is successfully resisting government efforts to bring him into the jurisdiction, will not be able to obtain dismissal of an indictment. This is as it should be. Otherwise, the courts would be sanctioning the playing of games by fugitives.

548 F.2d at 404 (Feinberg, C.J., concurring) (footnote omitted).

The third *Barker* factor to be considered is when the defendant asserted her right to a speedy trial. Since the bulk of the delay of which Blanco is complaining occurred between her indictment in 1975 and her arrest in 1985, and she only asserted her claim after her arrest, this factor does not help her case. *See Deleon*, 710 F.2d at 1222.

■ The final *Barker* factor to be considered is prejudice to the defendant. Blanco claims, in her brief, that the long period of delay between her indictment and trial caused "great strains and disruptions" in her life and impaired her defense.

■ Blanco's assertions of prejudice are not at all persuasive. We are not likely to be easily persuaded by the complaint of an appellant that she was prejudiced by delay when the appellant caused the delay. Moreover, Blanco's insistence, which failed to persuade the district court, that she did not know of the indictment undermines her assertion that the indictment put a strain on her life. Finally, since delay can just as easily hurt the government's case, Blanco's general claim that the delay impaired her defense also lacks force. *See Loud Hawk*, 474 U.S. at 315, 106 S.Ct. at 656. Blanco's argument that she suffered prejudice during the nine-month period from the time she was first seen by DEA agents in California until her arrest is conclusory and unpersuasive. This nine-month period was insignificant compared to the more than ten year period between her indictment and trial, and Blanco fails to specify any particular prejudice that she suffered during those nine months. *See United States v. McGrath*, 622 F.2d 36, 41 (2d Cir.1980) (general and unsubstantiated assertions of prejudice do not help defendant's case).

■ In addition to her claim under the sixth amendment, Blanco claims that the government violated her right to a speedy trial under Fed.R.Crim.P. 48(b). Rule 48(b) only applies to delays following arrest. *United States v. Marion*, 404 U.S. 307, 319, 92 S.Ct. 455, 462, 30 L.Ed.2d 468 (1971); *DeLeon*, 710 F.2d at 1223. Primarily, Blanco's complaint on appeal concerns the delay which occurred before her arrest. We conclude that Fed.R.Crim.P. 48(b) is inapposite.

■ Blanco also claims that the government violated this Circuit's rules, in effect at the time of her indictment, which re-

quired the government to be ready for trial within six months from the date of a formal charge against a defendant. Second Circuit Rules Regarding Prompt Disposition of Criminal Cases § 4 (McKinney 1975). Section 5(d) of these rules excludes from the six month period any time in which the defendant was absent or unavailable. According to § 5(d), a defendant is absent when his location is unknown, and his location cannot be found by due diligence or he is attempting to avoid prosecution. A defendant is unavailable when his location is known but his presence cannot be obtained by due diligence. For the reasons discussed above, Blanco was either absent or unavailable during the entire period before her arrest. Therefore, the government did not violate this Circuit's 1975 rules regarding the prompt disposition of criminal cases.

### Evidentiary Issues

▇▇▇ Additionally, Blanco claims that her fifth amendment right to a fair trial was violated. First, she argues that Judge Cannella should have allowed her to cross-examine Carmen and Gloria Caban about their alleged participation in a murder. The judge's ruling excluding cross-examination on this matter did not deny Blanco a fair trial.

The scope and extent of cross-examination lies within the discretion of the trial judge. *United States v. Rahme,* 813 F.2d 31, 37 (2d Cir.1987); *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). A trial judge abuses his discretion in curtailing cross-examination of a government witness when the curtailment denies the jury "sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *Singh,* 628 F.2d at 763. Clearly Judge Cannella did not abuse his discretion in regard to the cross-examination of Carmen Caban. The district judge allowed inquiry into Caban's cooperation agreement with the government, her extensive career as a drug dealer, and her many past acts of lying, stealing, and defrauding.

Thus, the jury had considerable information which enabled it to appraise Caban's credibility and possible motives for testifying falsely.

We will not disturb the trial judge's ruling that inquiry into the murder would have been far more prejudicial than probative. In *United States v. Esdaille,* 769 F.2d 104, 108 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985), we held that we would not overturn a trial judge's evidentiary rulings unless the judge acted arbitrarily or irrationally. *See also United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983) (trial court's evidentiary rulings will not be overturned absent a clear showing of abuse of discretion). At trial, Judge Cannella explained that he would not allow an inquiry into the murder because if the jury thought Caban participated in a murder, it might attempt to "punish" her by acquitting Blanco. The district judge's reasoning for his decision to forbid cross-examination about the murder was not irrational or arbitrary. This is also true with respect to his decision to forbid inquiry into the murder during the cross-examination of Gloria Caban. Therefore, we will not disturb that ruling either.

▇▇▇ Next, Blanco claims that the district judge violated her right to a fair trial by admitting evidence that, when she was arrested, Blanco used a false name and was found to be carrying false identification papers. Blanco argues that the long period between her alleged crime and her arrest made the prejudicial effect of this evidence greater than any probative value it may have had.

The trial judge did not err in admitting this evidence. As we have noted, we will not disturb evidentiary rulings which are not irrational or arbitrary. *Esdaille,* 769 F.2d at 108. In admitting evidence regarding Blanco's false name and false papers, Judge Cannella instructed the jury that this evidence did not necessarily show consciousness of guilt and he even suggested reasons why an innocent person might conceal her identity. In charging the jury, he told the jury that it alone had to decide

whether concealing her identity was indicative of a consciousness of guilt by Blanco. The trial judge's instructions to the jury reveal that he carefully considered his decision to admit this evidence and took steps to check any unfair prejudice it might create. The decision to admit it clearly was not irrational or arbitrary.

Further, Blanco contends that she was prejudiced by the admission of evidence concerning arrests of drug couriers, seizures of drugs, and conversations between suspected drug dealers. She argues that this evidence had little or nothing to do with her. This argument has no merit. The prosecution introduced this evidence to prove that Blanco was part of a drug importing conspiracy, and the district court admitted the evidence because it was linked to Blanco. For example, Judge Cannella admitted evidence of Antonio Romero's 1972 arrest at Kennedy airport in connection with efforts to smuggle cocaine into the United States in a dog cage. The link between this evidence and Blanco was Caban's testimony that Blanco in 1972 had discussed with a cohort the use of dog cages to smuggle cocaine into New York and later that year discussed with the cohort their losses when one of their couriers was arrested at Kennedy Airport for trying to smuggle cocaine in a dog cage.

Finally, Blanco argues that the district judge erred in his jury charge because he never targeted for the jury's consideration the factors to consider in deciding whether a single conspiracy existed. This is incorrect; in his charge Judge Cannella instructed the jury that it could find no conspiracy, or it could find more than one, and that if it did not find there was a single conspiracy, it could not convict. It is a proper instruction in a prosecution charging existence of a conspiracy to stress that the jury may not convict unless there is a finding that the single conspiracy charged existed, *see United States v. Tramunti,* 513 F.2d 1087, 1108 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975), and that proof of separate conspiracies is not sufficient, *see United States v. Nersesian,* 824 F.2d 1294, 1302 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). Measured against

this standard, Judge Cannella's charge clearly was proper.

For the foregoing reasons, the judgment of the district court is affirmed.