[No. G020681. Fourth Dist., Div. Three. Feb. 19, 1998.]

COUNTY OF ORANGE, Plaintiff and Respondent, v.
RANGER INSURANCE COMPANY, Defendant and Appellant.

## COUNSEL

Nunez & Bernstein and E. Alan Nunez for Defendant and Appellant.

Laurence M. Watson, County Counsel, Thomas C. Agin, Assistant County Counsel, and Karyn J. Driessen, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**SONENSHINE, Acting P. J.**—Ranger Insurance Company (Ranger) appeals the trial court's order denying its motion to overturn a bail forfeiture ruling. Finding the motion was properly denied, we affirm.

### I

### FACTUAL AND PROCEDURAL BACKGROUND

On September 1, 1995, Ranger, the surety for H & H Bail Bonds, posted a $25,000 bail bond to secure Ramiro Pineda's release from custody pending criminal charges. A month later, Pineda pleaded guilty to six counts of selling narcotics and admitted having suffered two prior narcotics convictions. (Health & Saf. Code, §§ 11352, subd. (a), 11370.2, subd. (a).) However, because Pineda, a Mexican national, failed to appear for sentencing, the court ordered his bail forfeited. Notice of the forfeiture order was mailed to Ranger on November 6.

In April 1996, Ranger sent a letter to the Orange County District Attorney's Office which states, "H & H Bail Bonds has detained, or will be detaining [Pineda] in the presence of local law enforcement in the jurisdiction which [he] is located. [¶] This letter is to determine if there will be an

extradition or if you, as the prosecuting agency, will not be able or has chosen not to, extradite."

Deputy District Attorney Burl Estes wrote back to Ranger, explaining the requirements of Penal Code section 1305, subdivision (g) had to be met before granting relief from bail forfeiture, including detaining and identifying the defendant in the presence of local law enforcement officers.[1] Estes also informed Ranger, "It is difficult, if not impossible, to extradite someone from Mexico." In fact, Estes warned, his office could not legally elect to extradite Pineda if he were a Mexican citizen.

On May 6, Ranger filed a motion to vacate the bail forfeiture. In support, it submitted information purportedly establishing Pineda's detention in Mexico, including Pineda's picture, fingerprints and Mexican driver's license, and an affidavit from a Mexican police officer. Ranger represented these documents would "be verified by the appropriate individuals prior to the motion." Ranger further asserted because Mexican nationals may be extradited to the United States in some cases, the district attorney was required to elect whether to seek Pineda's extradition under section 1305, subdivision (g).

In opposition to Ranger's motion, county counsel objected to Ranger's documentary evidence purporting to establish Pineda's detention in Mexico (i.e., the picture, fingerprints, license, etc.) as lacking authentication. County counsel also argued (1) section 1305, subdivision (g) did not apply where the defendant flees to a foreign country, (2) international extradition is "a matter of federal treaty and diplomacy" and therefore outside the prerogative of the Orange County District Attorney's Office, and (3) the district attorney was not required to elect whether to seek Pineda's extradition in light of Mexico's traditional reluctance to extradite its own citizens.

In support of the latter argument, county counsel submitted a declaration from Estes stating that since he began handling extradition matters in 1987, he has "never successfully prepared an extradition package for extradition by the United States of a fugitive in Mexico. This is because the law of Mexico

---

[1]Enacted in 1995, Penal Code section 1305, subdivision (g) provides: "In all cases of forfeiture where a defendant is not in custody and is beyond the jurisdiction of the state, is temporarily detained, by the bail agent, in the presence of a local law enforcement officer of the jurisdiction in which the defendant is located, and is positively identified by that law enforcement officer as the wanted defendant in an affidavit signed under penalty of perjury, and the prosecuting agency elects not to seek extradition after being informed of the location of the defendant, the court shall vacate the forfeiture and exonerate the bond on terms that are just and do not exceed the terms imposed in similar situations with respect to other forms of pretrial release."

All further statutory references are to the Penal Code unless noted otherwise.

and the current extradition treaty specifically provides that Mexico is not required to deliver up its nationals to the United States. Mexican policy, in actual practice, has been to deny extradition requests and instead request that [information involving alleged crimes] be sent there so the fugitive can be tried in Mexico[.]"

Estes further declared he had recently confirmed such policy with both federal and state authorities and been informed exceptions to the policy are made only in rare circumstances involving heinous crimes, not routine drug offenses. Thus, Estes opined, "Even if a firm and positive identification of Defendant Pineda were to be made, I would be wasting taxpayers' money to 'elect' to extradite. Electing to extradite a Mexican national for a nonheinous offense is not an option available to a local prosecutor."

At the motion hearing the trial court, over county counsel's objection, allowed Ranger to authenticate its documentary evidence through Eduardo Rosiles, a private investigator for H & H Bail Bonds. Rosiles explained he located Pineda in Guerrero, Mexico, in April 1996, and with Pineda's permission, took him to the local police station.[2] There, Pineda was finger-printed and photographed with a local law enforcement official. Rosiles also obtained a photocopy of Pineda's Mexican driver's license, which had been recently issued. Pineda told Rosiles, "I will never go back [to the United States], because I'm facing 20 years in jail."

Despite Rosiles's efforts, the trial court denied Ranger's motion to vacate the bail forfeiture. The court stated it is "common knowledge" extradition requests for Mexican nationals are "futile acts" and "there is no, quote, unquote, 'extradition back'" from Mexico. The court thus ruled section 1305, subdivision (g) is a "domestic statute," which was "designed and drafted in particular for extraditions that took place in this country."

II

ISSUES

Ranger argues section 1305, subdivision (g) does apply when the defendant flees to a foreign country and the district attorney's office must elect whether to seek extradition, even where any extradition attempt would likely

---

[2]The meeting was apparently prearranged by Pineda's relatives in the United States, who were assured Pineda would not be extradited at that time.

be futile. After initial briefing on these issues, we asked the parties to submit additional briefing concerning the legislative intent behind section 1305, subdivision (g), and whether the district attorney's office has authority to extradite a defendant who is located in a foreign country.

### III

### DISCUSSION

**A.** *Does section 1305, subdivision (g) apply when the defendant is detained by bail agents in a foreign country?*

■ In answering this inquiry, ". . . we strive to ascertain and effectuate the Legislature's intent. [Citations.]" (*People* v. *Loeun* (1997) 17 Cal.4th 1, 8 [69 Cal.Rptr.2d 776, 947 P.2d 1313].) This is done by examining "the plain meaning of the actual words of the law" and giving them " ' "their usual and ordinary meaning. . . ." ' " (*Id.*, at p. 9 citations omitted.) " 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' " ' " (*Ibid.*)

■ The geographic scope of section 1305, subdivision (g) is set forth in simple language: It applies when a defendant is detained by bail agents "beyond the jurisdiction of the state." Plainly, this includes situations in which the defendant is located in another country. Therefore, we need not look beyond the words of the statute.

However, even assuming the statutory language were ambiguous, the legislative history indicates the statute was intended to apply when the defendant is located outside the country. The law's proponents informed the Legislature that section 1305, subdivision (g) was needed to address the situation where "a defendant is located in another state *or country* by the bail agent, but is not in custody." (Letter to Sen. Milton Marks from Mark L. Bernstein, May 4, 1995, p. 2, italics added.) The law's supporters even supplied examples in which defendants had been tracked "around the world," to such places as Canada and Europe. (*Ibid.*; Sen. Com. on Crim. Proc. & Assem. Com. on Public Safety, legis. bill file on Sen. Bill No. 1245 (1995-1996 Reg. Sess.).) The Legislature's failure to restrict the scope of the statute under these circumstances suggests it intended the statute to have a global reach.

Prior decisional law also put the Legislature on notice section 1305 could apply when the defendant flees to another country. In *People* v. *United Bonding Ins. Co.* (1970) 12 Cal.App.3d 349 [90 Cal.Rptr. 714], the surety challenged a bail forfeiture order on the ground the defendant was being detained in Mexico on criminal charges. At the time, section 1305 allowed for forfeiture relief upon proof the defendant was dead or " 'physically unable, by reason of illness or insanity, or by reason of *detention* by civil or military authorities, to appear in court[.]' " (12 Cal.App.3d at p. 353, original italics.)[3] The People argued section 1305 was inapplicable because the defendant was being held by officials of a foreign nation. (*Id.* at p. 354.) However, because the words "civil or military authorities" were unrestricted, the court found they applied when the defendant was being detained in a foreign country. (*Ibid.*)

Despite the holding in *United Bonding*, county counsel argues we should restrict section 1305, subdivision (g) to cases where the defendant is located within the United States because (1) the district attorney lacks authority to extradite a defendant located in a foreign country, and (2) the statute was ostensibly designed to provide forfeiture relief when the defendant had not been entered into the nationwide warrant system, NCIC (National Crime Information Center). (See Assem. Com. on Public Safety analysis of the June 19, 1995, version of Sen. Bill No. 1245 (1995-1996 Reg. Sess.) (July 11, 1995).)[4] County counsel misconstrues the statute.

Under section 1305, subdivision (g), the prosecuting agency is merely required to elect whether to seek extradition, which, even in international cases, the district attorney is empowered to do. (See Zagaris & Peralta, *Mexico-United States Extradition and Alternatives: From Fugitive Slaves to Drug Traffickers—150 Years and Beyond the Rio Grande's Winding Courses* (1997) 12 Am. U. J. Internat. L. & Poly. 519, 551-556 [although international extradition requests are ultimately administered by the United States Department of State, they are initiated by the local prosecutor].) Moreover, the legislative record reflects law enforcement officials from other countries can contact California officials to verify whether fugitives have been entered into the NCIC in deciding whether to make an arrest. (Sen. Com. on Crim. Proc., legis. bill file on Sen. Bill No. 1245 (1995-1996 Reg. Sess.).)

---

[3]This basis for forfeiture relief is currently set forth, in substantially similar language, under section 1305, subdivision (d).

[4]In this situation, law enforcement officials and bail agents would be disinclined to take the defendant into custody for lack of legal authorization.

B. *Is the district attorney required to elect whether to seek extradition when extradition is not feasible?*

■ County counsel agues even if the statute applies when the defendant is located abroad, it is not triggered when extradition is not feasible. We agree.

Section 1305, subdivision (g) provides for relief when the defendant is, inter alia, detained and identified "and the prosecuting agency elects not to seek extradition after being informed of the location of the defendant[.]" But what happens when extradition is not a feasible option for the prosecuting agency? Does that mean it has elected not to seek extradition under the statute? The answer is no.

The term elect implies a choice of options. (See Am. Heritage Dict. (2d college ed. 1982) p. 442 [Elect means, "To make a choice or selection."].) And under section 1305, subdivision (g), the implication is that the prosecutor will have the option whether or not to seek extradition. When extradition is not feasible, there can be no meaningful election whether to seek extradition, and the conditions for forfeiture relief have not been satisfied.

C. *What is the government's burden of proof in establishing the defendant's extradition is not feasible?*

While no court has had occasion to examine this question in interpreting section 1305, subdivision (g), courts have examined this issue in other contexts. For example, in *U.S.* v. *Blanco* (2d Cir. 1988) 861 F.2d 773, Blanco argued the 10-year delay between her indictment and trial violated her right to a speedy trial. (See U.S. Const., Amend. VI.) In so doing, she asserted the United States should have tried to extradite her from her native Colombia before she was ultimately apprehended while visiting the United States.

The court recognized the government's "constitutional duty to make a diligent, good faith effort to bring a defendant to trial promptly. [Citations.]" (*U.S.* v. *Blanco, supra,* 861 F.2d at p. 778.) However, the court found, "[T]he government had no duty to request the extradition of Blanco from Colombia . . . . Due diligence does not require the government to pursue goals that are futile. [Citation.] Before 1982, the existing United States-Colombia

extradition treaty did not require Colombia to surrender its citizens under the treaty and the record evidence reveals that, in any event, the Colombian government had a policy of denying extradition requests involving its citizens. It seems clear that, before 1982, a request by the government for the extradition of Blanco would have been futile. The futility of such a request is confirmed by evidence that, on at least two occasions before 1982, extradition requests made to Colombia for the surrender of Colombian citizens were denied." (*Ibid.*)

The reasoning of *Blanco* applies equally in this case. Whatever duty the government has in deciding whether to seek a defendant's extradition under section 1305, subdivision (g), that duty does not require the government to undertake futile acts. (See generally, Civ. Code, § 3532 ["The law neither does nor requires idle acts."].) Extradition will be deemed infeasible when the host country, as a matter of policy and practice, refuses to grant extradition requests in the category of cases involved in the controversy at hand.

D. *Did the government prove Pineda's extradition was not feasible?*

The extradition treaty between the United States and Mexico provides the necessary backdrop for this issue. Under article 9 of the treaty, neither country is required to extradite its nationals. (Extradition Treaty Between United States of America and United Mexican States, Agreement of May 4, 1978, 31 U.S.T. 5059, 5065, T.I.A.S. 9656.) Rather, the executive authority of the requested country has discretionary power to extradite, if it is not prevented by its laws and it deems such extradition proper. (*Ibid.*) Mexican law prevents the extradition of nationals absent exceptional circumstances. (Mexican Law of International Extradition, ch. I, art. 14 (Dec. 29, 1975) ["Ningun mexicano podra ser entregado a un Estado extranjero sino en casos excepcionales a juicio del Ejecutivo."]; see generally, Zaid, *Military Might Versus Sovereign Right: The Kidnapping of Dr. Humberto Alvarez-Machain and the Resulting Fallout* (1997) 19 Hous. J. Internat. L. 829, 836-837; Note, *Neighboring Countries; Un-neighborly Acts: A Look at the Extradition Relationships Among the United States, Mexico, and Canada* (1995) 4 J. Transnat. L. & Poly. 121, 128-129; Comment, *United States v. Alvarez-Machain: The Deleterious Ramifications of Illegal Abductions* (1993) 17 Fordham Internat. L.J. 126, 136-138.)

■ Deputy District Attorney Estes, an extradition specialist in the Orange County District Attorney's Office for the past decade, reiterated this

policy in his declaration to the court. Unlike his experience in seeking to extradite defendants from other countries, Estes has "never successfully prepared an extradition package for extradition by the United States of a fugitive in Mexico." An extradition specialist in the San Diego County District Attorney's Office told Estes that Mexico had extradited fugitives to the United States in two cases under the treaty. "However, those exceptions were only for offenders charged with 'heinous crimes,' not drug offenses which are common in the United States and Mexico." According to Estes, "Even if a firm and positive identification of Defendant Pineda were to be made, [he] would be wasting taxpayers' money to 'elect' to extradite. Electing to extradite a Mexican national for a nonheinous offense is not an option available to a local prosecutor."

Ranger did not offer any evidence to contradict Estes's declaration. Instead, while admitting "there have been very few nationals extradited from Mexico," Ranger's attorney argued "that is certainly something that changes from day to day and no one can be extradited until the request is made." However, a prosecutor is not required to "butt his [or her] head against a wall just to see how much it hurts." (*United States* v. *Kehm* (7th Cir. 1986) 799 F.2d 354, 360.) Given Mexico's demonstrated reluctance to extradite its own nationals for nonheinous offenses, the prosecution was not required to make a formal request for Pineda's extradition from the Mexican government. The record firmly supports the trial court's finding extradition was infeasible in this case.[5]

## IV

### CONCLUSION

We hold section 1305, subdivision (g) may apply when the defendant is detained by bail agents in a foreign country. However, regardless of where the detention occurs, the circumstances of each case must be examined to determine whether the defendant's extradition is feasible. If the record shows extradition is not feasible, the prosecutor has no real choice in deciding whether to seek the defendant's extradition, and the terms of section 1305, subdivision (g) have not been met. ▪▪▪ Because the record here clearly proves gaining Pineda's extradition from Mexico was not

---

[5]This ruling should not be construed as foreclosing forfeiture relief whenever the defendant is detained in Mexico. Extradition policies are subject to change, and Mexico may, in the future, become more amenable to extraditing its own citizens to the United States. Each case must be evaluated individually to determine the feasibility of obtaining extradition under the circumstances presented.

feasible, the trial court properly denied Ranger's motion to vacate the forfeiture order.[6]

Rylaarsdam, J., and Bedsworth, J., concurred.

A petition for a rehearing was denied March 11, 1998, and appellant's petition for review by the Supreme Court was denied April 29, 1998.

---

[6]In light of this holding, we need not decide whether Ranger supplied the trial court with a timely and adequate factual basis for proving Pineda's detention in Mexico. However, we do offer the following response to Ranger's cursory argument Pineda's flight to Mexico renders the bail contract void, entitling Ranger to the bond money: "The escape of a defendant is the business risk of a bail surety. It is precisely the situation which a surety guarantees against. Appellant insured the risk by securing property of the defendant. The fact that appellant is now unable to deliver the defendant or fully collect on [its] collateral will not shift the risk to the obligee." (*State* v. *Ohayon* (1983) 12 Ohio App.3d 162 [467 N.E.2d 908, 911]; see also *Frank* v. *State* (1994) 99 Md.App. 227 [636 A.2d 484, 486], in which the court, in denying the surety's request to discharge its obligation on a bail bond stated, "The defendants voluntarily fled the country. Appellant insured against that flight, and must now suffer the consequence.")