UNITED STATES of America

v.

**Jose Luis ESCAMILLA, Defendant.**

**No. CR.A.B093015109.**

United States District Court,
S.D. Texas,
Brownsville Division.

Jan. 29, 2003.

Mr. Ricardo Lara, Assistant United States Attorney, Brownsville, TX, for Petitioner.

Mr. Anthony Troiani, Brownsville, TX, for Respondent.

## ORDER DENYING DEFENDANT'S SPEEDY TRIAL MOTION

HANEN, District Judge.

## I. INTRODUCTION

Jose Luis Escamilla moved this court to dismiss his narcotics trafficking indictment, arguing that the nine-year period between his 1993 indictment and 2002 arrest constitutes a speedy trial violation. A hearing on this issue was held on January 22, 2003. Following the four-part test set out in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), this court denies Escamilla's motion. Although the extraordinary length of the delay in this case raises a presumption of prejudice, Escamilla precipitated the delay by fleeing to Mexico and prolonged the delay by failing to assert his right to a speedy trial after his return to the United States until after his arrest despite knowing he was wanted by the authorities. Finally, Escamilla has not proven actual prejudice resulting from the delay.

## II. BACKGROUND

On September 23, 1993, a 15–count indictment charging Jose Luis Escamilla and 11 others for various narcotics violations was filed in the United States District Court for the Southern District of Texas. The indictment charged Escamilla with possessing marijuana with intent to distribute it and conspiring with others to do the same. Three of his brothers were charged with similar trafficking offenses. Federal agents conducted raids on Escamilla's house in Brownsville, Texas, along with the houses of several of the other alleged co-conspirators (including three of his brothers' houses) on the morning of October 5, 1993. Escamilla left for Mexico as few as one and a half hours before the officers arrived at his house, abandoning his wife, three children, home, and possessions. Escamilla, his wife, Maria Guadalupe Escamilla–Hemandez, and his eldest son, Jose Luis Escamilla, Jr., each testified that Escamilla's decision to leave was motivated solely by marital discord and that the timing of his departure (just before the early morning raid on his house) was completely coincidental. All three testified that Escamilla moved to Mexico to live there with another woman, Luz Maria Matamoros.

Federal agents returned to Escamilla's home on numerous occasions, but it appeared that Escamilla had left both the United States and his family for good. Confidential informants corroborated this suspicion. Escamilla's name was entered into several federal crime databases including the National Crime Information Computer (NCIC), Texas Crime Information Computer (TCIC), and the Treasury Enforcement Communications System (TECS). In addition, customs and immigration inspectors operating along the United States–Mexico border were advised to keep a "lookout" for Escamilla. Escam-

illa's fugitive status was periodically updated by federal agents in charge of his case.

After leaving Brownsville, Escamilla claims that he spent a few days in Matamoros and then moved to Tampico, Mexico, and found work in the construction industry. In 1994 the government learned that Escamilla had been detained in Mexico on a narcotics charge. The government did not seek to extradite Escamilla or have him expelled. Escamilla's charges were dismissed and he was subsequently released after approximately eight months. Confidential sources continued to report that Escamilla remained in Mexico after his release, though agents testifying at the hearing could not say when and how often these reports were made.

Escamilla testified that he performed construction work in Mexico and Texas after his release, and that he crossed the border repeatedly under his own name using his resident alien card. He further testified that in 1996 he obtained a "border crosser" card for his one-year old son, Jose Luis Escamilla–Matamoros. Escamilla testified that he moved to Florida with his new family in 1996 and continued to perform construction work there, first for a company identified as "Murray Drywall" and later for another firm that built temporary housing at MacDill Air Force Base near Tampa, Florida. Jose Jr. testified that his younger brother Rene did construction work with his father in Mississippi and later in Florida beginning in 1999. Jose Jr. further testified that he also moved to Florida to work with his father at MacDill Air Force Base sometime in late 2001, after the September 11 tragedy.

In 1998 Esteban Escamilla, one of the Escamilla brothers named in the indictment who had also left for Mexico, was arrested while trying to cross the United States–Mexico border at Brownsville when inspectors queried his name in the NCIC and TECS systems. Esteban pled guilty and fled back to Mexico before he could be sentenced; he apparently remains at large.

Escamilla testified that he lost his wallet containing his social security card, resident alien card, and other documentation in 2001 or 2002. An incident report from the Fellsmere, Florida, police department indicates that Escamilla reported this loss on October 30, 2002, and further indicates that Escamilla reported that the loss occurred sometime between the 23rd and 29th of that month. That same day, Escamilla went to the Immigration and Naturalization Service office in West Palm Beach, Florida, to obtain a new resident alien card. Following protocol, the office performed a computer search and discovered the pending criminal indictment that Escamilla now seeks to dismiss. Escamilla was detained by authorities at the INS office and transferred to Brownsville for arraignment and prosecution.

## III. DISCUSSION

 In analyzing a Sixth Amendment Speedy Trial claim based on post-indictment delay, this court must consider four factors: 1) the length of the delay, 2) the reason for the delay, 3) the defendant's diligence in asserting his Sixth Amendment right, and 4) prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). This court follows the analysis described by the Supreme Court in *Doggett v. United States*, 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), and further delineated by the Fifth Circuit in *United States v. Bergfeld*, 280 F.3d 486, 488–89 (5th Cir.2002) and *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir.2002).

### A. Length of Delay and Summary of Analysis

 The threshold inquiry is whether the post-indictment delay was long enough

to trigger a "speedy trial" analysis. *Doggett*, 505 U.S. at 651–52, 112 S.Ct. 2686. The nine-year delay in this case is the type of "extraordinary" delay that clearly triggers the analysis. *Id.* at 652, 112 S.Ct. 2686 (holding that 8½-year lag between indictment and arrest "clearly suffices to trigger the speedy trial enquiry"). Thus, this court must weigh "the length of the delay, the reason for the delay, and [the] defendant's diligence in asserting his ... rights ... against the prejudice to the defendant." *Bergfeld*, 280 F.3d at 488. "Depending on how heavily the first three factors weigh for or against the defendant, prejudice is presumed in some cases, relieving the defendant of any burden to show actual prejudice." *Id.*

The first factor, length of the delay, weighs heavily in favor of the defendant in this case. *See Doggett*, 505 U.S. at 652, 112 S.Ct. 2686 ( "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time."); *see also* 2 Wayne LaFave & Jerome Israel, Criminal Procedure § 18.2, at 405 (1984) (collecting cases and noting that lower courts have generally found post-accusation delay presumptively prejudicial as it approaches one year). However, as detailed below, the second and third *Barker* factors—reason for delay and defendant's assertion of his right—weigh against the defendant. Thus, prejudice cannot presumed in this case. *Compare Bergfeld*, 280 F.3d at 489–90 (holding that prejudice should be presumed where five-year delay caused by government's negligence and defendant did not know of indictment and therefore could not have asserted right) *with United States v. Aguirre*, 994 F.2d 1454, 1457–58 (9th Cir.1993) (holding that defendant must show actual prejudice following five-year delay where government's efforts to locate defendant were diligent and defendant knew of charges from the beginning but failed to answer them). As described more fully below, Escamilla has not proven

any significant actual prejudice. Even if he had, he would not be entitled to relief, because the delay in this case was precipitated by his flight to Mexico and prolonged by his failure to demand trial or other resolution of the charges against him. *See Aguirre*, 994 F.2d at 1458 (reasoning that even severe actual prejudice would not tip balance in defendant's favor where government diligently pursued defendant and defendant was aware of charges against him but failed to demand a trial).

## B. Reason for the Delay

Escamilla contends that the second *Barker* factor should weigh heavily in his favor because the government's negligence is the exclusive cause of the lengthy delay in this case. *See Doggett*, 505 U.S. at 657, 112 S.Ct. 2686 (stating that government negligence is an unacceptable reason for delaying prosecution and that judicial "tolera[nce] of such negligence varies inversely with its protractedness"); *see also Smith v. Hooey*, 393 U.S. 374, 383, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969) (holding that government has duty to make diligent, good faith efforts to bring defendant to trial promptly). The government contends, of course, that Escamilla knew of the indictment against him and fled prosecution, thus precipitating the delay. *See Reynolds*, 52 F.3d at 764 (holding that no speedy trial violation occurred where "most of the [nine-year] delay was caused by the fact that [the defendant] fled the jurisdiction following his offense"). The government further contends that its efforts to locate Escamilla once he fled to Mexico were reasonably diligent.

Thus, whether the defendant fled the indictment or just fortuitously left the country is of critical importance. In *Doggett* the government stipulated at the district court level that Doggett was unaware

"of the indictment before he left the United States in March 1980, or prior to his arrest," and the Supreme Court refused to go behind this stipulation on appeal. *Id.* at 653, 112 S.Ct. 2686. The government in this case has not made such a concession. Instead, it has attacked Escamilla's credibility (and that of his wife and son) by circumstantial evidence. To paraphrase Escamilla's position, he claims that he "fought" with his wife the night before the raid, and early the next morning (just before he was to be arrested and his house searched), he decided to leave his wife, children, home, and possessions and live permanently in Mexico, never to return to his former home even once to see his children, collect his belongings, or wrap up his affairs. Further, he asserts that he did not find out he was wanted by the authorities until he was arrested in October 2002. In support of this claim, he called both his wife and son to testify. Their testimony, in summary, was that Escamilla left their home to live with another woman, that the timing of his departure was purely coincidental, and that they never told Escamilla that he was wanted by the authorities.

The government counters that this story defies credibility. The government relies on the testimony elicited both on direct and cross that Escamilla was one of twelve defendants charged in a 15-count indictment. Included in that indictment were his brothers Esteban, Carlos, and Jose Manuel. The latter two were arrested on the day of the raid. Also included in that indictment were Julio Nevarez, Sr., Julio Nevarez, Jr. and Mauricio Ramos, who were also arrested. Escamilla was considered one of primary defendants along with the two Nevarez defendants and Esteban. Escamilla's brother Carlos was considered to be a minor defendant. Carlos was ap-

prehended later and the charges against him were subsequently dismissed. Many of the defendants mentioned above made bail and fled to Mexico where they apparently remain today. Esteban was captured in 1998 attempting to return to the United States from Mexico, pled guilty and then later failed to appear for sentencing. Carlos remained in the Brownsville area. In fact, Escamilla used Carlos to arrange visits with his son, Rene.

The government further points out that on the morning of October 5, 1993, Mr. Escamilla left without taking any of his possessions, without taking any of his clothes, and without taking his son, Jose Jr., who was supposed to accompany him on a job-related trip to Matamoros that day. From that date forward, Mr. Escamilla has never returned to his home in Brownsville to retrieve any of his possessions, talk with his estranged wife, or visit his children. All contact with his children for many years was arranged through his brother, Carlos.[1] The government elicited testimony that Escamilla owned a construction company with several of his brothers, including two who were indicted along with him in 1993, Jose Manuel and Carlos. Escamilla also owned a small ranch in Matamoros, and his brothers would occasionally visit him there after he left Brownsville. The government argues that given such circumstances, it is beyond belief that Escamilla did not know he was wanted by federal authorities.

This court, having heard the testimony, viewed the witnesses, and performed its duty to judge their credibility, agrees with the government that the defendant's version of the facts is not credible. *See Goodwin v. Johnson,* 224 F.3d 450, 457 (5th Cir.2000) (district court may determine

---

1. Escamilla offered very ambiguous testimony regarding conversations with Carlos. He first testified that Carlos told him that he, Escamil-

la, had no problem with the law; moments later Escamilla testified that Carlos told him that he, Escamilla, *did* have a problem.

witness is not credible and refuse to accept even uncontradicted testimony) (citations omitted); *see also United States v. Davis*, 329 F.Supp. 493, 495 (W.D.Pa.1971) (denying motion for acquittal and noting that jury properly chose to believe circumstantial evidence rather than direct testimony). The testimony clearly shows that Escamilla and his wife fought on many occasions. It seems incredible to this court that out of these many occasions, just hours before the raid took place, Escamilla decided to permanently abandon his family, home, and possessions and go live in Mexico, where he remained by his own account until 1995.

Even if the court momentarily suspends disbelief regarding the reasons Escamilla gives for his departure, the court further does not believe the testimony that no one later told him he was wanted by the authorities. First, his house was searched and his wife and children questioned regarding Escamilla's whereabouts. Next, three of his brothers were also indicted in 1993. Two of them, Carlos and Jose Manuel, were arrested on the day of the raid, while Esteban and the defendant in this case managed to avoid apprehension. Carlos and Jose Manuel presumably saw the indictment and learned that their brother Jose Luis Escamilla had also been indicted.[2] Jose Manuel apparently fled to Mexico shortly after his arrest, as did at least three other individuals indicted as part of the same indictment. The charges against Carlos were dismissed in January 1994. Escamilla testified that after he left Brownsville he arranged visits with his son, Rene, through Carlos. Finally, there is substantial circumstantial evidence that Escamilla had other contact with his brothers after he left Brownsville: both at

Escamilla's ranch and through operation of the construction company. It stretches the bounds of imagination that not one of his family members, friends or associates ever mentioned to him over the past of ten years that he had been indicted and/or was wanted by the authorities.

Lastly, when he returned to the United States, he did not return to live and work in the Brownsville area where he had family and property, but instead chose to live and work in the southeastern part of the United States and *never* returned to his own house (which was periodically monitored by federal agents).

In summary, Escamilla precipated the delay in this case by fleeing to Mexico and prolonged the delay by failing to surrender to the authorities when he returned to live in the United States. Thus, even if the government's efforts to find Escamilla following his flight to Mexico were negligent, Escamilla would still be the principal cause of the delay he now claims amounts to a violation of his right to a speedy trial. Out of an abundance of caution, however, the court will also put to rest Escamilla's contention that the government's efforts to apprehend him were negligent.

Escamilla attempts to liken the government's efforts in this case to those found negligent in *Doggett.* 505 U.S. at 652–53, 112 S.Ct. 2686. Government agents learned that Doggett had left for Colombia a few days before police officers attempted to arrest him at his parents' house in North Carolina in 1980. *Id.* at 648–49, 112 S.Ct. 2686. A DEA agent placed Doggett's name in the TECS database to catch him upon his return, but the entry lapsed in less than a year. *Id.* at 649, 112 S.Ct. 2686. The same agent later learned that

---

**2.** The indictment was unsealed on November 8, 1993. Julio Nevarez, Julio Nevarez, Jr., and Jose Manuel Escamilla all forfeited their bonds by failing to appear on December 2 or

3, 1993. The government claims that all three fled to Mexico. Carlos Escamilla's case was dismissed on January 6, 1994.

Doggett was arrested in Panama in 1981, but rather than initiate extradition proceedings he simply asked Panama to expel Doggett to the United States. *Id.* The State Department learned that Doggett left Panama for Colombia in 1982, but did not communicate this information to the DEA. *Id.* The original DEA agent on the case later fortuitously learned of Doggett's move in 1985 but made no effort to confirm this information or track down Doggett either abroad or in the United States. *Id.* at 649–50, 112 S.Ct. 2686. In fact, Doggett had returned to the United States in 1982. *Id.* at 649, 112 S.Ct. 2686. He settled in Virginia, married, earned a college degree, and found a steady job, all under his own name. *Id.* In 1988 the Marshal's Service ran a credit check on several thousand people subject to outstanding arrest warrants and located Doggett within minutes. *Id.* at 650, 112 S.Ct. 2686. The Court held that the government's lethargic efforts to apprehend Doggett constituted "findable negligence" and affirmed the magistrate's finding. *Id.* at 652–53, 112 S.Ct. 2686.

Despite its superficial similarities, the instant case is distinguishable. The government in this case was more diligent in its attempts to apprehend the defendant than it was in *Doggett.* After the raid, agents conducted continued surveillance on Escamilla's house, checked license plate numbers on vehicles located at the house against computer databases to identify possible associates that might know Escamilla's whereabouts, and checked phone records for the same reason. Federal agents placed Escamilla's name in three different law enforcement computer systems (TECS, TCIC and NCIC) and issued a "lookout" for Escamilla to border agencies. Agents testified that these entries were periodically updated and never lapsed. Their testimony is corroborated by the fact that both Escamilla and his brother Esteban were apprehended using information in these databases. *Contrast*

*Doggett,* 505 U.S. at 649, 112 S.Ct. 2686 (noting that TECS entry expired half a year after Doggett left the country), *and Bergfeld,* 280 F.3d at 488 (noting that agents intended to enter the names of three suspects in the NCIC and TECS but that only one name was actually entered). In the years following Escamilla's flight to Mexico, agents received information from confidential informants that he, like his alleged co-conspirators, remained there. Customs agent Mike Battistelli testified that confidential informants continued to indicate that Escamilla remained in Mexico even after being released from detention in Mexico. FBI agent Joe Strantz indicated that Escamilla's case remained active and pending up to the time of his arrest in 2002. Thus, in contrast to *Doggett,* the government in this case made significant efforts to secure his arrest and did not unreasonably fail to act on relevant information concerning Escamilla's whereabouts.

The defendant, understandably in light of *Doggett,* places great emphasis on the fact that the federal authorities knew Escamilla was under arrest in Mexico on drug charges and did not seek his extradition or expulsion. However, in this case, unlike *Doggett,* the person sought was not a citizen of the United States. Escamilla is a Mexican citizen, and agents from both the Customs Service and from the FBI testified that it is practically impossible to get a Mexican citizen extradited or expelled from Mexico. In fact, both agents concluded such efforts were futile and not worth attempting. Given this testimony, the court finds the failure to make such attempts does not constitute evidence of negligence. *See United States v. Blanco,* 861 F.2d 773, 776, 778 (2d Cir.1988) (holding that government had no duty to request extradition of defendant, a Colombian citizen, from Colombia where Colombian president indicated

he would not extradite drug smugglers as required by treaty between United States and Colombia).

Escamilla also emphasizes the government's alleged failure to actively search for him after his narcotics charges in Mexico were dismissed. Again, this court does not find that these efforts sink to the level of negligence. In hindsight, one can always point to additional methods that might have been employed, but that does not mean the methods used were substandard. The government kept Escamilla's case active, periodically updated entries in various national and local crime databases, and continued to receive intelligence that Escamilla was still in Mexico.

The fact that Escamilla was allegedly able to enter this country on multiple occasions undetected is not substantial evidence of governmental negligence. As the agents explained at the speedy trial hearing and as is commonly known, thousands cross the Brownsville–Matamoros border daily; only a small minority of these can realistically be scrutinized.[3]

The "border crosser" card Escamilla claims to have obtained for his son in 1996 is more troubling. INS agent Joe Reyna testified that Escamilla would have been required to present proof of identification, residency, and solvency to obtain the card. The card is issued in the name of "Jose Luis Escamilla–Matamoros." It is possible that the child's mother (Luz Maria Matamoros), and not Escamilla himself, obtained the card, but the government did not make this contention, so the court will assume that Escamilla's story is true. Nonetheless, this single documented lapse certainly does not justify a conclusion that the government was negligent in failing to apprehend Escamilla.

As an aside, the court was not pleased with the quantity or quality of proof from either side regarding the cause for the delay. Joe Strantz, the FBI agent who testified to the government's efforts to apprehend Escamilla, had not reviewed his entire case file and did not bring the file to court. Thus, not only could he only testify from memory to the government's efforts to apprehend Escamilla; he simply could not claim to know the extent of those efforts. Customs agent Mike Battistelli was similarly unprepared to speak to all of the efforts made (or not made) by his office over the past decade to apprehend Escamilla. This paucity of detail lends much credence to defense counsel's argument that little effort to apprehend Escamilla was actually being expended, especially following the dismissal of charges against Escamilla in Mexico in 1994 or 1995.

Similarly, the defendant testified that he has been living and working openly in the United States since 1995 or 1996 under his own name. Any number of records could have been produced to confirm this testimony: business records, tax records, rental agreements, mortgages, insurance records, his son's 1999 Florida birth certificate. The dearth of these records, some or all of which should be readily available, gives substantial credence to the government's claim that Escamilla did not cross the border at established entry points using his own name or live openly in this country.

---

**3.** The government further argued that Escamilla may have either crossed illegally or crossed using false identification. In support of this argument, the government submitted evidence of false identification bearing Escamilla's photograph found in his home the day of the raid in 1993. However, the government could not substantiate any recent use of fake ID's by Escamilla, and this court does not rely upon this evidence in ruling that the government was not negligent in attempting to apprehend Escamilla.

Either side could have produced much more compelling evidence, which would have both strengthened that side's claim and made this court's evaluation of the issue much more direct. For instance, Escamilla repeatedly emphasized that the defendant in *Doggett* was apprehended by a simple credit check, and that the government's failure to take this step years earlier was a significant reason for the ultimate finding of government negligence in that case. *See Doggett,* 505 U.S. at 650, 653, 112 S.Ct. 2686. The government in this case likewise put on no proof that it ever performed a credit check on Escamilla, although FBI agent Strantz indicated that such checks are routinely done to locate suspects. However, this court cannot consider these failures equivalent. The government reasonably believed Escamilla remained in Mexico up to the time of his arrest in 2002. Further, Escamilla has not produced satisfactory evidence that a credit check would have been availing before

2002, nine years after he fled to Mexico.[4] In fact, what little documentary evidence Escamilla has produced is perfectly consistent with his having returned to this country as late as 2002, the year he was arrested.[5] Thus, the documentary evidence is not inconsistent with the government's belief that Escamilla was still in Mexico. This court will not hold that the government has a duty to perform credit checks on suspects it reasonably believes remain abroad, especially when the defendant has not persuaded the court that this information was incorrect.[6]

While conceding to the defendant that the government's increased diligence in immigration and border inspection matters following the September 11, 2001, tragedies might have led to his earlier apprehension, this court does not find that the government's efforts fall below the standard of care in this case. Further, as noted above, even if the government's efforts could be considered negligent, the

---

**4.** Escamilla attempted to submit a May 2002 letter and October/ November 2002 account statement from a credit card company as proof that he had a credit card in his own name. However, Escamilla never authenticated this document, and it was not admitted into evidence. Even had this letter been admitted, it would only suggest that Escamilla's credit history in this country began sometime in 2002.

**5.** Besides the non-admitted credit card letter and statement, Escamilla submitted the October 2002 Fellsmere Police Department incident report discussed previously and a July 2002 letter from the Vero Beach One–Stop Center, Agency for Workforce Innovation, serving to formally introduce Escamilla as a skilled construction worker seeking employment with a carpentry firm. Finally, Escamilla submitted the birth registration card of his son, Luis Ernesto Escamilla, who was born on October 20, 1999, in Hillsborough County, Florida. This card does not purport to identify the child's parents or their residences. This court does not consider this registration card to be substantial evidence

that Escamilla was living openly in Florida in 1999.

**6.** This court notes that the Fifth Circuit has not resolved the issue of which side has the burden of proof to show the reason for the delay, *Cardona,* 302 F.3d at 498 & n. 1 (citations omitted), or what that burden entails. This court therefore assumes that the government bears the burden of proof, *see United States v. Brown,* 169 F.3d 344, 349 (6th Cir. 1999) (*cited in Cardona,* 302 F.3d at 498 n. 1), and finds that the government met its burden in this case by making out a prima facie case 1) that Escamilla knew of his indictment and fled to Mexico; and 2) that the government made reasonable non-negligent efforts to obtain his capture after his flight. Thus, this court's conclusion that the defendant did not successfully persuade the court that the government's efforts were negligent does not constitute what might otherwise be an impermissible shift of the burden of proof to the defendant. Rather, it simply means that the defendant did not successfully rebut the government's proof.

court finds that the defendant is still the principal cause of the delay in this case because the defendant both precipitated the delay by fleeing to Mexico and prolonged the delay by failing to report to authorities following his return to the United States.

## C. Defendant's assertion of the right

There is no doubt that Escamilla failed to demand a trial, dismissal, or any other resolution of the government's charges from the time of the indictment in 1993 until just before his trial setting in January 2003. In *Barker*, the Court "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532, 92 S.Ct. 2182. Escamilla argues that he cannot be penalized for failing to demand a trial when he did not even know he had been charged. *See Doggett*, 505 U.S. at 653–54, 112 S.Ct. 2686 (holding that defendant could not be taxed for only invoking his right post-arrest when the magistrate implicitly found that the defendant knew nothing of the indictment prior to his arrest); *Bergfeld*, 280 F.3d at 489 (holding that the third factor "weighed exclusively in Bergfeld's favor, as he had no idea the indictment existed until it was unsealed"). However, this court has already found that Escamilla fled prosecution in 1993. This court further found that, even if his departure to Mexico was as fortuitous as he claims, he must have learned shortly thereafter that he was wanted by the government. Therefore, he has no excuse for failing to assert his right before now. Accordingly, this factor weighs exclusively and heavily against Escamilla. *See Doggett*, 505 U.S. at 653, 112 S.Ct. 2686 (noting that third factor would weigh heavily against defendant if he had known of his indictment years before his arrest as government claimed); *Aguirre*, 994 F.2d at 1457–58 & n. 5 (reasoning that the speedy trial clause protects those who assert their rights, not those who acquiesce in delay, and further noting that defendants who seek to avoid arrest following indictment waive the right to a speedy trial altogether).

## D. Prejudice

The final part of the *Barker* test concerns the question of prejudice. The Supreme Court has stated that excessive delays presumptively compromise the reliability of a trial and raise the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence. *Doggett*, 505 U.S. at 654–55, 112 S.Ct. 2686; *Barker*, 407 U.S. at 532, 92 S.Ct. 2182. Nonetheless, some delays are inevitable and justified. For example, when a defendant goes into hiding, as in this case, the delay necessary for law enforcement to track him down is justified. *Doggett*, 505 U.S. at 656, 112 S.Ct. 2686.

As discussed above in Part III.A., the Fifth Circuit has recently addressed the issue of whether the defendant is entitled to a presumption of prejudice. *Cardona*, 302 F.3d at 497; *Bergfeld*, 280 F.3d at 488. "Depending on how heavily the first three factors weigh for or against the defendant, prejudice is presumed in some cases, relieving the defendant of any burden to show actual prejudice." *Cardona*, 302 F.3d at 497 (citations omitted).

The first factor (extraordinary delay) clearly weighs in favor of Escamilla. As discussed in Part III.B. and III.C., the second and third factors favor the government because the defendant fled prosecution and never demanded a speedy trial and because the government's efforts to apprehend him were not negligent. The evidence proffered by Escamilla that he did not know of the indictment is simply beyond belief. It is the finding of this court that the defendant's sudden desire to

visit Mexico the morning of his arrest is more than just coincidence. The defendant's initial flight and subsequent decision not to come forward and demand a trial principally caused the delay, not the government's imperfect but reasonable efforts to apprehend him. That being the case, the defendant bears the burden under *Bergfeld* and *Cardona* to come forth with specific evidence of prejudice.

Escamilla has raised two claims of actual prejudice. First, he testified that he sustained a head injury which, combined with the passage of time, has diminished his ability to recall matters that might be helpful to his case. It should be noted that according to his own testimony, this injury predated the time when the government tried to arrest him in 1993. Consequently, this injury would have presumably impaired his memory even had he been arrested and brought to trial in 1993. The second claim is somewhat related to the first. Escamilla claims that he was hospitalized for his head injury, and that the dates of his hospitalization might aid a possible alibi defense, except that he might not be able to obtain the relevant hospital records after so many years. Escamilla made this claim for the first time in his post-hearing motion, and made no serious attempt to substantiate his claimed injury, resulting hospitalization, or the unavailability of the relevant records at the hearing.

While the court is concerned about this problem, given the lack of evidence to support it, given the fact that this court has found that the government was not negligent and did not cause the delay in the trial, and given the court's conclusion that the defendant's claim that he did not know of the pending charges is simply too incredible to believe, the court finds that the inquiries required by *Barker* and *Doggett* weigh in favor of the government and the court denies the Motion to Dismiss.

This ruling was based on the evidence presented to this court at the January 22nd speedy trial hearing. Trial began on January 27th. The court communicated its ruling on the speedy trial issue to the parties by January 25th, but in an effort not to prejudice either side at trial the court did not release this opinion until after the jury retired to deliberate on January 29, 2003.